FILED
2008 Oct-02  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | |
|---|---|
| **BRUCE E. WALKER, and** ) | |
| **KIMBERLY SMITH-MCKENZIE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.:  7:01-CV-2977-VEH** |
| ) | |
| **SUMTER COUNTY** ) | |
| **COMMISSION; SUMTER** ) | |
| **COUNTY, ALABAMA; STATE OF** ) | |
| **ALABAMA DEPARTMENT OF** ) | |
| **PUBLIC SAFETY, and JOHNNY L.** ) | |
| **HATTER, in his official capacity as** ) | |
| **Sheriff of Sumter County,** ) | |
| ) | |
| **Defendants.** ) | |

---

### MEMORANDUM OPINION

## I.    INTRODUCTION AND PROCEDURAL HISTORY

### A.    Plaintiffs' Claims

Plaintiff Bruce Walker ("Walker") and subsequently added Plaintiff Kimberly

Smith-McKenzie ("Smith-McKenzie")[1] bring this job discrimination case on the basis

of race (Walker only), gender (Smith-McKenzie only), and retaliation against

---

[1]  Walker originally filed his case on November 20, 2001.  (Doc. 1).  Smith-McKenzie was added by amendment on January 25, 2002.  (Doc. 2 ¶ 6).

Defendants (1) Alabama Department of Public Safety ("ADPS");[2] (2) Defendant

Johnny L. Hatter ("Sheriff Hatter"),[3] in his official capacity as Sheriff of Sumter

County and in his individual capacity;[4] (3) Sumter County Sheriff's Department (the

"Sheriff's Department"); (4) Sumter County Commission (the "Commission"); and

(5) Sumter County, Alabama (the "County") (sometimes all the Sumter-related parties

---

[2]  The undisputed division of the ADPS that was involved is the Alabama Bureau of Investigation ("ABI").

[3]  Sheriff Hatter is an African-American male.

[4]  The court notes that while the most recent amended complaint (Doc. 45) alleges that Sheriff Hatter is being sued not only in his official but also in his individual capacity, the summary of Plaintiffs' claims in the parties' subsequently filed (*i.e.*, on December 11, 2003) amended status report (*see* Doc. 104 § III at 4, 10, 15, 17) indicates that the claims against Sheriff Hatter are asserted against him in only his official capacity.  However, both sides still address the defense of qualified immunity to some degree in their summary judgment briefs.  In any event, Plaintiffs will need to clarify, as part of the proposed pretrial order, the extent to which they are still seeking to impose individual liability on Sheriff Hatter, given the scope of the claims that remain as a result of this memorandum opinion.  Relatedly, the Sumter Defendants will also need to indicate in the proposed pretrial order which remaining claims, if any, as to which Sheriff Hatter will assert a defense of qualified immunity at trial and also will need to suggest in the proposed pretrial order an appropriate way for the court to handle consideration of such a defense, including in particular the jury's role.  *See, e.g., Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002) ("It is important to recognize, however, that a defendant is entitled to have any evidentiary disputes upon which the qualified immunity defense turns decided by the jury so that the court can apply the jury's factual determinations to the law and enter a post-trial decision on the defense.")  As discussed *infra*, the court grants summary judgment in favor of Sheriff Hatter based on the defense of qualified immunity (and the defense of state immunity) for those claims which he specifically asserted were barred by such defense(s).

are collectively referred to as the "Sumter Defendants") under Title VII, § 1981, and the Fourteenth Amendment of the United States Constitution pursuant to § 1983 with respect to equal protection and procedural due process (Walker only) rights. (*See* Doc. 45 ¶ 1; *see generally id.*; *see also* Doc. 104 § III (summarizing Plaintiffs' claims)).

The third and most recently amended complaint contains a total of eighteen counts. (*See generally* Doc. 45). Plaintiffs' global prayer at the end of the complaint seeks injunctive as well as monetary relief, including front pay, back pay, interest, compensatory damages, punitive damages, costs, and attorneys' fees. (*Id.* § IV at 45).

### 1.   Smith-McKenzie's Alleged Claims[5]

Count I is asserted by Smith-McKenzie against Sheriff Hatter in his official capacity for sexual harassment, discrimination, retaliation, and constructive discharge in violation of Title VII. Count II  is asserted by Smith-McKenzie against Sheriff Hatter in his individual capacity for sexual harassment, discrimination, retaliation,

---

[5] The shotgun nature of Plaintiffs' pleading makes it difficult to determine the exact scope of all the counts. Further, the headings on each count do not always mirror the substance of the allegations contained within the count. Additionally, the court has also relied on the parties' amended status report for further clarification of Plaintiffs' claims; however, as noted in n.4, *supra*, for example, still some differences exist when comparing the third amended complaint with the subsequent summary of claims provided by Plaintiffs in the joint status report. The court has, however, attempted to decipher each claim despite an overall lack of clarity and consistency in the pleadings and other filings.

and constructive discharge in violation of the Equal Protection Clause of the Fourteenth Amendment through § 1983.

Count III is asserted by Smith-McKenzie against the Commission for sexual harassment, discrimination, retaliation, and constructive discharge in violation of Title VII. Count IV is asserted by Smith-McKenzie against the Commission for sexual harassment, discrimination, retaliation, and constructive discharge in violation of the Equal Protection Clause of the Fourteenth Amendment through § 1983.

Count V is asserted by Smith-McKenzie against the County for sexual harassment, discrimination, retaliation, and constructive discharge in violation of Title VII. Count VI is asserted by Smith-McKenzie against the County for sexual harassment, discrimination, retaliation, and constructive discharge in violation of the Equal Protection Clause of the Fourteenth Amendment through § 1983. Finally, Count VII is asserted by Smith-McKenzie against ADPS for sexual harassment, discrimination, retaliation, and constructive discharge in violation of Title VII.

### 2.    Walker's Alleged Claims

Count VIII is asserted by Walker against Sheriff Hatter in his official capacity for retaliation in violation of Title VII. Count IX is asserted by Walker against the Commission for retaliation in violation of Title VII.

Count X is asserted by Walker against the County for retaliation in violation

of Title VII.  Count XI is asserted by Walker against ADPS for retaliation in violation of Title VII.

Count XII is asserted by Walker against Sheriff Hatter in his official capacity for race discrimination and retaliation in violation of Title VII.  Count XIII is asserted by Walker against Sheriff Hatter in his individual capacity for race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and § 1981 through § 1983.

Count XIV is asserted by Walker against the Commission for race discrimination and retaliation in violation of Title VII.  Count XV is asserted by Walker against the Commission for race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and § 1981 through § 1983.

Count XVI is asserted by Walker against the County for race discrimination and retaliation in violation of Title VII.  Count XVII is asserted by Walker against the County for race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and § 1981 through § 1983.  Finally, Count XVIII is asserted by Walker against Sheriff Hatter in his official capacity and/or the Commission for violation of procedural due process under the Fourteenth Amendment through § 1983.

### B.    Stay Period

This case was stayed (Doc. 96) on October 30, 2003, per the request of Walker,

due to his military service.  After a hearing, the status of this stay was reconfirmed on December 16, 2003.  (Doc. 105).

The undersigned inherited this case by reassignment on July 2, 2004.  (Doc. 107).  Pursuant to the Motion to Lift Stay (Doc. 131) filed on November 30, 2007, the abeyance relating to Walker's military service was lifted (Doc. 132) by the court on December 7, 2007.

### C.    Defendants' Motions

The pending motions are:   (1) ADPS's Motion for Summary Judgment including its supporting evidence (Doc. 133) and supporting brief (Doc. 134) filed on March 5, 2008; and (2) the Sumter Defendants' Motion for Summary Judgment (Doc. 135), supporting brief (Doc. 136), and evidentiary materials (Doc. 137) filed on March 6, 2008.

Plaintiffs responded to ADPS's Motion for Summary Judgment with their opposition (Doc. 139) and evidentiary materials (Doc. 140) on March 26, 2008.  On March 27, 2008, Plaintiffs filed their opposition (Doc. 141) and evidentiary support (Docs. 142, 143) to the Sumter Defendants' Motion for Summary Judgment.

Finally both ADPS and the Sumter Defendants filed their reply briefs (Docs. 144, 145) on April 7, 2008.  For the reasons explained below, the court concludes that ADPS's Motion for Summary Judgment is due to be granted, and the Sumter

Defendants' Motion for Summary Judgment is due to be granted in part and denied in part.

## II.    STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted).  "The substantive law applicable to the case determines which facts are material."  *Fitzpatrick*, 2 F.3d at 1115 (citation omitted).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as

7

modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[6]

Under the *McDonnell Douglas/Burdine* framework, a plaintiff first has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must either prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination or present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02. The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that

---

[6] Neither Walker nor Smith-McKenzie maintains that this lawsuit involves any examples of direct evidence claims. (*See generally* Docs. 139, 141).

no thumb is to be placed on either side of the scale).

## III.   STATEMENT OF FACTS[7]

### A.   Statement of Facts Common to Both Motions

Smith-McKenzie, an African-American female, began working as a part-time

dispatcher in the Sheriff's Department on July 25, 2000.  AAF No. 2;[8] (Doc. 104 §§

II.2, II.7).  She was employed in the position of dispatcher up to and until her last day

of employment in or around January 2, 2001.  (*See* Doc. 137 at Ex. 15 (indicating last

---

[7]   Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  *See Fitzpatrick*, 2 F.3d at 1115.  Therefore, these are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[8]   The designation "AF" stands for admitted fact and indicates a fact offered by ADPS that Plaintiffs have admitted in their written submissions on summary judgment, in their deposition testimony, or by virtue of any other evidence offered in support of their case.  Whenever Plaintiffs have adequately disputed a fact offered by ADPS, the court has accepted Plaintiffs' version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of  ADPS's Statement of Facts as set forth in Doc. 134 and responded to by Plaintiffs in Doc. 139.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Plaintiffs' Statement of Additional Facts contained in Doc. 139 and responded to by ADPS in Doc. 144.

Because of the voluminous number of facts asserted by the parties as a result of two pending dispositive motions, the court has endeavored to limit its recitation to those facts it finds to be critical to its decision.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

date of discriminatory action on January 2, 2001)).[9]  Smith-McKenzie filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 18, 2001, alleging sex discrimination, retaliation, and sexual harassment. (Doc. 137 at Ex. 15).

Smith-McKenzie maintains that, during her employment, she was subjected to unwelcome sexual advances and other inappropriate sexual conduct directed towards her by Sheriff Hatter.  Smith-McKenzie also alleges that she was constructively discharged as a result of discrimination and retaliation against her upon reporting her complaints of sexual harassment on the part of Sheriff Hatter.

More specifically, Smith-McKenzie complains that from August 2000 through October 2000, she inquired to Sheriff Hatter about a full-time position and, each time she approached Sheriff Hatter, he subjected her to unwelcome sexual harassment, including the following:  he told Smith-McKenzie that she "looked good" and asked her to hug his neck; he asked her for her home phone number; he told her that there was just something about her body build that he liked; he asked her to go out with him and told her that her mother was too old for him because he liked women between the ages of 18 and 25; he repeatedly asked her to call him and have phone

---

[9]  None of the parties' briefs references the exact last day of employment for Smith-McKenzie.

10

sex with him; he told her to call him from work on her night shift to have phone sex with him; he told her that phone sex was not cheating and then told her that he and a lady in Chicago called each other to have phone sex and they would talk dirty on the phone and caress their body parts and ejaculate; he told her that one day while he was mowing his yard and his lawn mower was vibrating and he took his penis out and laid it on the lawn mower and jacked off; he asked her if she ever played with herself, and told her everyone played with themselves; he told her that Rhonda, a lady he dated, was too old and he just used her for her brains; he told her that Johnnie McCoy, another lady he dated, had gotten too fat after she had her baby, that he could get with her whenever he got ready, and that she was just good enough for giving "head"; and he told her that he just liked to have phone sex.  AF No. 3; (*see also* Doc. 140 at Ex. B (Smith-McKenzie Depo.) at 35, 36-38, 47-48, 52-56, 57-59, 60-63, 71-73, 153)).  Smith-McKenzie did not welcome his advances and repeatedly informed Sheriff Hatter she could not do the sexual things he was asking of her.  AF No. 4; (*see also* Doc. 140 at Ex. B at 37-38, 55-58, 71)).

Walker, a white male, began working in the Sumter County Sheriff's Department on October 18, 1996, as a patrol deputy.  AAF No. 1; (Doc. 104 §§ II.1, II.6).  In general, Walker maintains that he was retaliated against, culminating in his discharge from the Sumter County Sheriff's Department was on February 15, 2001,

after engaging in good faith protected activity relating to Smith-McKenzie's complaint of sexual harassment against Sheriff Hatter.  (Doc. 104 § III.A.3 at 11-12).

Walker filed an initial EEOC charge on February 8, 2001, alleging retaliation. (Doc. 137 at Ex. 18).  He later amended his charge on May 10, 2001, to include race discrimination, and again on July 18, 2001, to assert additional allegations relating to his termination from the Sheriff's Department.  (*Id.* at Exs. 19, 20).

## B.    Statement of Facts Pertaining to ADPS's Motion for Summary Judgment

In October of 2000, Anthony Frost ("Agent Frost"), an agent with the ABI, the investigative arm of ADPS, was contacted via telephone by his brother-in-law, Robert Cottrell ("Sergeant Cottrell"),[10] a sergeant with the Sheriff's Department.  AF No. 1; (Doc. 143 at Ex. D at 6).  Sergeant Cottrell told Agent Frost that an employee of the Sheriff's Department had come to him as the supervisor of that office with a complaint of sexual harassment against Sheriff Hatter.  AF No. 2.  Sergeant Cottrell indicated to Agent Frost he needed help on what to do with the complaint because Sheriff Hatter was his boss and he "didn't know where to proceed with it from there." AF No. 3.[11]

---

[10]   Sergeant Cottrell is an African-American male.

[11]   While Plaintiffs admit this fact, they also expand upon it citing to the deposition of Sergeant Cottrell.  (Doc. 139 ¶¶ 1-3 at 3).  However, the court notes that

Agent Frost told Sergeant Cottrell that he would advise his supervisors of the situation and that they would know best how to handle it.  AF No. 4.  Then Agent Frost contacted Smith-McKenzie and talked to her about her complaints against Sheriff Hatter.  AF No. 5.  After talking to Smith-McKenzie about her allegations, Agent Frost, along with his supervisor Lieutenant Loyd Arrington, went to Major Hallford ("Major Hallford"), the head of the ABI, and talked to him about the situation.  AF No. 6.

Major Hallford directed Agent Frost to set up a meeting with Smith-McKenzie to meet with Major Hallford.  AF No. 7.  Agent Frost set up a meeting to take place on or about November 9, 2001, but Smith-McKenzie did not appear at that meeting; instead, as Agent Frost had directed her to call Major Harper ("Major Harper"), she contacted him in November 2000 about her allegations of sexual harassment against Sheriff Hatter, and Major Harper then set up an appointment to see Smith-McKenzie. AF No. 8; (Doc. 104 § II.8).

Smith-McKenzie's attorney sent a letter to the Sumter County Commission and Sheriff Hatter dated November 13, 2000, advising that he represented her regarding her complaints of sexual harassment and hostile work environment and seeing about

---

the correction citation to this additional testimony is instead to the deposition transcript of Agent Frost.

the possibility of resolving the matter prior to the necessity of involving the Equal Employment Opportunity Commission. (Doc. 137 at Ex. 9; Doc. 104 § II.9). After receiving this correspondence, Sheriff Hatter had the district attorney request the ABI to investigate what he felt was extortion, and Sheriff Hatter also testified that he "called the ABI to go and investigate this case." AF No. 9; (Doc. 133 at Ex. E (Hatter Depo.) at 132).

On December 1, 2000, Major Hallford received a letter from the District Attorney of Sumter County, Nathan Watkins ("District Attorney Watkins"), requesting the ABI to investigate threats of extortion against Sheriff Hatter. AF No. 10. District Attorney Watkins wrote this letter to Major Hallford after Sheriff Hatter came and told him he believed some people were involved in falsely accusing him (*i.e.*, Sheriff Hatter) of sexual harassment for extortion. AF No. 11[12] District Attorney Watkins believed that the elements of extortion existed when he wrote Major Hallford asking for the investigation. AF No. 12.[13]

---

[12] Plaintiffs' stated clarification of this particular fact does not connect with the overall context of ADPS's fact, so ADPS's version is accepted. (Doc. 139 ¶ 11 at 5).

[13] Plaintiffs provided no response to this particular fact; therefore, it is deemed admitted. Alternatively, it may be that Plaintiffs' response to No. 11 really is meant to apply to ADPS's No. 12. From that possible perspective, the court still accepts ADPS's No. 12, but also accepts Plaintiffs' clarification and takes judicial notice that lawyers are encouraged by the courts to try and resolve matters before litigation.

When Major Hallford received the letter from District Attorney Watkins he contacted Lieutenant Odom ("Lieutenant Odom") in Mobile and asked if he had someone he could send to Sumter County.  AF No. 13.  Lieutenant Odom told him that Charles Huggins ("Agent Huggins") was available.  AF No. 14.  Major Hallford then wrote District Attorney Watkins informing him that Agent Huggins had been assigned to investigate the extortion threats against Sheriff Hatter.  AF No. 15.

Major Hallford was never contacted by Sheriff Hatter regarding this investigation.  AF No. 16. The purpose of the investigation was to gather facts relating to the alleged extortion threats against Sheriff Hatter.  AF No. 17.  The job of the investigator was to determine all the pertinent facts possible relating to the allegations.  AF No. 18.

Agent Huggins, after he was assigned the case, conducted interviews with persons having knowledge of the alleged extortion threats against Sheriff Hatter.  AF No. 20.   Agent Huggins interviewed Walker twice during the course of his investigation. Sumter AF No. 5.5[14]  The initial interview took place on December 13, 2000.  (*See* Doc. 137 at Ex. 13 at 2 (indicating interview initiated on December 13, 2000, and date ended on December 14, 2000)); Sumter AF No. 5.6.  During this

---

[14]   "Sumter AF No. ___" refers to the Sumter Defendants' Statement of Facts and Plaintiffs' Claims set forth in Doc. 136 at 1-4 that Plaintiffs have admitted to (either expressly or by failing to adequately dispute them) in Doc. 141.

interview, Walker stated he had "no personal knowledge of the Sheriff harassing SMITH or SMITH attempting to extort money from the Sheriff." (Doc. 137 at Ex. 13 at 2); Sumter AF No. 5.7.

Immediately after this interview, Walker contacted Agent Huggins and stated "he was not going to be able to sleep tonight because he had lied during the initial interview." (Doc. 137 at Ex. 14 at 2).[15] His explanation for not being truthful "was because he felt uncomfortable being interviewed at the Sheriff's Department." (*Id.*; Doc. 137 at Ex. 4 at 133 (testifying that he "[i]mmediately called Agent Huggins and told him that "'you put me in a bad spot'" during the interview process because of the location). He further explained that Smith-McKenzie had told him about the alleged harassment by Sheriff Hatter, and that he had "advised SMITH that it was best if she reported the incident through her chain of command and to file a complaint with the EEOC." (Doc. 137 at Ex. 14 at 2). Walker also admitted "to seeing a wire and tape recorder on KIMBERLY SMITH at the Sheriff's Department on 10/25/2000." (*Id.*). Walker reiterated, however, that "he had no knowledge of Sheriff HATTER harassing SMITH and no knowledge of SMITH attempting to extort money from the Sheriff."

---

[15] As Plaintiffs point out, Walker corrected his testimony not only verbally, but also in writing. (Doc. 137 at Ex. 4 (Walker Depo.) at 135 ("He told me to put it in a statement and mail it to him [*i.e.*, Agent Huggins], which I did. And that was the 14th of December, shortly after -- as a matter of fact, I went back to the sheriff's office and typed up the statement on the computer and mailed it to him[.]")).

(*Id.*).

Walker was placed on administrative leave with pay on December 18, 2000. (Doc. 104 § II.13; Doc. 140 at Ex. 6 (stating that because Walker had "become a potential target" in "an ongoing criminal investigation being conducted by the [ABI,]" that it was "in [Walker's] best interest and the best interest of the Sumter County Sheriff's Department . . . to take this action")).  Sheriff Hatter testified that he  placed Walker on administrative leave because Agent Huggins told him that the "ABI [thought that] he [*i.e.*, Walker] needed to be on leave while the investigation went on."  (Doc. 133 at Ex. E at 52).  Walker was terminated from his position as Deputy Sheriff on February 15, 2001.  (Doc. 104 § II.12).

Agent Huggins gave District Attorney Watkins a summary of the investigation a few days prior to finishing his investigation on January 16, 2001.  AF No. 22.  Once Agent Huggins completed his investigation, he turned his investigation over to his ABI supervisors.  AF No. 21.  Agent Huggins's full report was delivered to District Attorney Watkins by mail from the ABI headquarters on May 9, 2001.  AF No. 26.

Even though Agent Huggins made no recommendations in his final investigative report, Sheriff Hatter was provided with information by the ABI as the investigation was ongoing and Sheriff Hatter spoke with Agent Huggins "quite a few times" during the course of it.  AF No. 23.  While Sheriff Hatter testified that Agent

17

Huggins recommended that Walker be placed on administrative leave during the investigation,  no other examples of any recommendations by Agent Huggins exist in the record.  AF No. 24.  Similarly, no evidence in the record shows that any authority or control to fire either Walker or Smith-McKenzie was ever delegated to ADPS as part of this investigation.  AF No. 27.[16]

The Office of Sheriff in the State of Alabama is a Constitutionally created office.  AF No. 28.  ADPS was created by an act of the Legislature and there are no provisions giving it control over a constitutional officer such as a sheriff or giving a county control over such department.   AF No. 29.

The ADPS is headed by a director who acts at the direction and control of the Governor of Alabama, while a sheriff's duties are set by statute and he has no control or authority over ADPS or over any employees of ADPS.  AF No. 30.  Under the laws of the State of Alabama, ADPS, the Sheriff's Department, and the County are distinct entities.  AF No. 31.  Counties are political subdivisions of the state, each created by sovereign power in accordance with sovereign will, and each exercising such power,

---

[16]  While Plaintiffs attempt to dispute this fact (Doc. 139 ¶ 27 at 7), they do so only by relying upon evidence showing ADPS's involvement in placing Walker on administrative leave with pay.  The court has already accepted evidence relating to ADPS's role in making this recommendation to Sheriff Hatter during the course of the ABI investigation; however, this same evidence does not establish that ADPS had any discharging authority over Walker or Smith-McKenzie.

and only such power, as is conferred upon it by law.  AF No. 32.

### C.    Statement of Facts Pertaining to the Sumter Defendants' Motion for Summary Judgment

In August 2000, Smith-McKenzie was informed by Sergeant Cottrell that a new jail was being built and that there would be a need for more dispatchers so she should talk to Sheriff Hatter about a full-time position.  Sumter AAF § I.B. No. 1.[17]  Smith-McKenzie first went to talk to Sheriff Hatter about the full-time dispatcher position in August 2000.  Sumter AAF § I.B Nos. 1-2.  Sheriff Hatter responded that he would make a request for a full-time dispatcher in the next budget meeting on October 1, 2000.  Sumter AAF § I.B No. 2.[18]

Also during the August 2000, meeting Sheriff Hatter told Smith-McKenzie that she "looked good" and he asked her to hug his neck.  Sumter AAF § I.C No. 1.1.[19]

---

[17]  "Sumter AAF § I.B No. ___" refers to Plaintiffs' Statement of Undisputed Facts set forth in § I.B of Doc. 141 that the Sumter Defendants have admitted to (either expressly or by failing to adequately dispute them) in Doc. 145.

[18]  The Sumter Defendants' efforts to dispute this fact are unavailing.  (Doc. 145 ¶ 2 at 2).  Sheriff Hatter's testimony indicating that he did not have a full-time dispatcher position opening is not inconsistent with requesting funding for one.  In any event, even if it is conflicting, the court must accept Smith-McKenzie's testimony over Sheriff Hatter's in considering the Sumter Defendants' Motion for Summary Judgment.

[19]  In filing their reply to Plaintiffs' opposition, the Sumter Defendants did not counter any part of Plaintiffs' Statement of Additional Disputed Facts.  (*See generally* Doc. 145).  Therefore, Plaintiffs' additional facts set forth in this particular section

These comments made Smith-McKenzie feel uncomfortable and she did not hug his neck, instead telling him that she smelled bad and then changed the subject.  Sumter AAF § I.C No. 1.2.

On September 21, 2000, Smith-McKenzie went to see Sheriff Hatter at his office about the full-time dispatcher position again.  Sumter AAF § I.B No. 7.  When Smith-McKenzie went in Sheriff Hatter's office on September 21, 2000, he asked her to close the door and then told her that there was just something about her body build that he liked.  Sumter AAF § I.C No. 2.1.  This made her feel uncomfortable but she still asked him about the full-time job.  Sumter AAF  § I.C No. 2.2.

Sheriff Hatter told her he still had not heard anything about the job.  Sumter AAF No. § I.C 3.1.  He then asked her about "going out" and she replied that her mother was single.  Sumter AAF No. § I.C 3.2.  Hatter laughed and told her, "Your mama don't want no man," and that she was too old because he liked women between the ages of 18 and 25.  Sumter AAF  § I.C No. 3.3.  Smith-McKenzie responded that

_____

(*see generally* Doc. 141 § I.C at 20-24) are all admitted for summary judgment purposes and are labeled as "Sumter AAF § I.C No. ___ " to distinguish them from the additional admitted facts of Plaintiffs admitted by ADPS as noted in n.8, *supra*. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (Sumter AAF § I.C No. 2.2) would indicate the second sentence of paragraph 2 of Plaintiffs' Statement of Additional Disputed Facts (as set forth in § I.C of Doc. 141) is the subject of the court's citation to the record.

she was married and could not go out with him.  Sumter AAF § I.C No. 3.4.

Sheriff Hatter then asked her to have phone sex with him and proposed that when she got to work she could just call him at home sometimes and have phone sex. Sumter AAF § I.C No. 4.1.  She again told Sheriff Hatter she was married and could not do that.  Sumter AAF § I.C No. 4.2.

Sheriff Hatter told her that phone sex was not cheating and explained that he and a lady in Chicago called each other to have phone sex and they would talk dirty on the phone and caress their body parts and ejaculate.  Sumter AAF § I.C No. 5.1. Smith-McKenzie replied she was married and could not do that.  Sumter AAF § I.C No. 5.2.

Sheriff Hatter told her again that it was not cheating because they would not be touching each other but would only touch their own bodies.  Sumter AAF § I.C No. 6.1.  Smith-McKenzie stated again she could not do that.  Sumter AAF § I.C No. 6.2.  Sheriff Hatter then told Smith-McKenzie that one day while he was mowing his yard and his lawn mower was vibrating and he took his penis out and laid it on the lawn mower and jacked off.   Sumter AAF § I.C  No. 7.1. Sheriff Hatter then asked her if she ever played with herself, to which she replied, "no," and he laughed and told her everyone played with themselves.  Sumter AAF § I.C  No. 7.2.  She did not laugh at his statements.  Sumter AAF § I.C No. 7.3.

21

Smith-McKenzie commented to Sheriff Hatter that Rhonda, a lady he was dating, was real nice. Sumter AAF § I.C No. 8.1. Sheriff Hatter replied that Rhonda was too old and he just used her for her brains. Sumter AAF § I.C No. 8.2.

Smith-McKenzie also brought up to Sheriff Hatter another lady he was supposedly seeing, Johnnie McCoy. Sumter AAF § I.C No. 9.1. Sheriff Hatter replied that Johnnie had gotten too fat after she had her baby, that he could get with her whenever he got ready, and that she was just good enough for giving "head." Sumter AAF § I.C No. 9.2.

Smith-McKenzie again asked Sheriff Hatter about the full-time job and he told her he would not forget her. Sumter AAF § I.C No. 10.1. Before she walked out of his office door, Sheriff Hatter asked her to promise him that she would think about having phone sex with him. Sumter AAF § I.C No. 10.2.

After this September 21, 2000, exchange with Sheriff Hatter, Smith-McKenzie spoke to Sergeant Cottrell about it. AAF § I.B. No. 8. Sergeant Cottrell indicated in a tape-recorded interview with Agent Frost that Smith-McKenzie "appeared to be somewhat semi-offended by it." (Doc. 143 at Ex. C (Agent Frost Depo.) at 123).[20]

---

[20] The Sumter Defendants' efforts to dispute this fact because Sergeant Cottrell vaguely indicated in his deposition that he did not remember making that statement to Agent Huggins is entirely ineffective because a transcription of the tape-recorded interview exists in the record establishing that he did make the statement. (Doc. 145 ¶ 8 at 2).

On September 23, 2000, Sheriff Hatter came in the jail and asked Smith-McKenzie why she did not call him and have phone sex with him like he had asked her to do.  Sumter AAF § I.C No. 11.1.  She told him she could not do that and he replied that it was not cheating and then he sat down behind her.  Sumter AAF § I.C No. 11.2.  Sheriff Hatter kept telling her that phone sex was not cheating because they would both be caressing their own body parts and having an erection and not touching each other.  Sumter AAF § I.C No. 11.3.  He asked her to call him around 12:00 and told her it was okay to call him during her night shift and talk dirty on the phone.  Sumter AAF § I.C No. 11.4.

After the September 23, 2000, incident with Sheriff Hatter, Smith-McKenzie told Sergeant Cottrell she did not feel comfortable going to Sheriff Hatter's office and Sergeant Cottrell replied that he only way he could help her was if she got Sheriff Hatter on tape.  Sumter AAF § I.C No. 12.1.  Sergeant Cottrell tried to get Smith-McKenzie to call Sheriff Hatter and have phone sex with him so that Sergeant Cottrell could listen to and record the conversation, but Smith-McKenzie refused to do so because it made her uncomfortable.  Sumter AAF § I.C No. 12.2.

Smith-McKenzie avoided Sheriff Hatter from September 23, 2000, until she spoke to him again on October 25, 2000, about the full-time dispatcher position.  Sumter AAF § I.B. No. 15.  While waiting to speak with Sheriff Hatter on October

25, 2000, Smith-McKenzie told Sergeant Cottrell and some other Sheriff's Department employees that she was being sexually harassed by Sheriff Hatter. Sumter AAF § I.B. Nos. 16.1, 16.2.

Walker then arrived at the office and overheard Smith-McKenzie's discussing her allegations of sexual harassment against Sheriff Hatter.  Sumter AAF § I.B. No. 16.2.  Smith-McKenzie asked Walker what he thought she should do and he told her to report it to Sergeant Cottrell, pointing at him,  as he was also present.  Sumter AAF § I.B. No. 17.1.  Walker also told her to report it to her chain of command and if that did not work, then to contact an equal opportunity representative.  Sumter AAF § I.B. No. 19.

When Smith-McKenzie left Sheriff Hatter's office on October 25, 2000, she told Sergeant Cottrell that she had recorded him.  Sumter AAF § I.C No. 13.1. Sergeant Cottrell and Deputy Rory then came to her house and listened to the audio tape.  Sumter AAF  § I.C No. 13.2.  Sergeant Cottrell told Smith-McKenzie that Sheriff Hatter was a stupid "mother fucker" for playing with a lawn mower and the mower should have "cut his dick off."  Sumter AAF § I.C No. 13.3.   Deputy Rory stated that, "anyone that fuck with a lawn mower, they need their dick cut off." Sumter AAF § I.C  No. 13.4.  Walker did not assist Smith-McKenzie in recording Sheriff Hatter, and only became aware of her intent to record him about fifteen (15)

24

to thirty (30) minutes before the recording took place.  Sumter AAF § I.B. No. 20.

Smith-McKenzie took the audio tape of her October 25, 2000, conversation to a local business to have the tape enhanced.  Sumter AAF § I.B No. 36.1.  The man who ran the business told her that he recognized the voice on the tape as one of his customers, that he did not enhance the tape, and that he wanted her to destroy the tape in his presence because she could go to jail or be killed over the tape.  Sumter AAF § I.B No. 36.2.  He also told her that Sheriff Hatter and Chief Deputy Eddie Larkin were his best customers. Sumter AAF § I.B No. 36.3.

In November 2000, Tyrone Clark ("Deputy Clark") told Smith-McKenzie that, per Commissioner Chris Spencer, the county budget had been approved and would allow for a full-time dispatcher.  Sumter AAF § I.B No. 23.1.  She told Deputy Clark that she did not think she would get the position because she would not have phone sex with Sheriff Hatter.  Sumter AAF § I.B No. 23.2. Clark responded by telling her "to do whatever [she] had to do to get the damn job."  Sumter AAF § I.B No. 23.3.

Also in November 2000, Sheriff Hatter showed Walker the letter from Smith-McKenzie's attorney, Mark Majors ("Majors").  Sumter AAF § I.C No. 14.1.  Sheriff Hatter expressed disbelief to Walker about the letter and told Walker that he was going to fire Smith-McKenzie.  Sumter AAF § I.C No. 14.2.

Per Agent Huggins's investigative notes and audio taped interview, Sergeant

25

Cottrell stated that Sheriff Hatter threatened to fire Smith-McKenzie when he received the letter from her lawyer: "he was upset about it and I know he picked up the phone and he said, 'I'm going to fire that -- fire that bitch.'" Sumter AAF § I.C No. 15. Sheriff Hatter also told Sergeant Cottrell to, "go talk to that crazy bitch and tell her to drop the charges,"and Sergeant Cottrell said he would talk to her. Sumter AAF § I.C No. 16.

After Sheriff Hatter received the settlement letter from Majors, Smith-McKenzie's co-workers would no longer speak to her or work with her to swap shifts as they had in the past. Sumter AAF § I.B No. 34.[21] When Smith-McKenzie returned to her shift, Donna Goldston ("Goldston"), another dispatcher, informed her that she was no longer allowed to perform her job duties other than to only give air traffic; she was no longer allowed to answer the phones, to take 911 calls, to page; and she would no longer have access to Southern Linc in the dispatch office. Sumter AAF § I.B No. 35.1. Sergeant Cottrell later informed Smith-McKenzie to be very careful because Sheriff Hatter had put Goldston to work watching everything she said or did. Sumter AAF § I.B No. 35.2.[22]

---

[21] The Sumter Defendants' evidentiary citation does not adequately dispute Plaintiffs' fact for the purposes of summary judgment. (Doc. 145 ¶ 34 at 2).

[22] The Sumter Defendants' evidentiary citation does not adequately dispute Plaintiffs' fact for the purposes of summary judgment. (Doc. 145 ¶ 35 at 2).

After Walker's December 14, 2000, interview with the ABI, Sheriff Hatter approached him and told him all the deputies were being interviewed and that if it was the last thing that he ever did, Sheriff Hatter was going to fire that "bitch" and see Smith- McKenzie in the jail in a black and white suit.  Sumter AAF § I.C No. 17.

## IV.   ANALYSIS

### A.   ADPS's Motion for Summary Judgment

ADPS states that the causes of action in Plaintiffs' complaint against it are limited to Title VII counts of "sexual harassment, discrimination and retaliation." (*See* Doc. 134 at 2 (citing Doc. 104 at 4)).  As Plaintiffs clarify, Smith-McKenzie asserts Title VII claims of sexual harassment, sex discrimination and retaliation against ADPS.  (*See* Doc. 139 at 1 (citing Doc. 45 Count VII)).  Walker asserts only a Title VII retaliation claim against ADPS.  (Doc. 139 at 2 (citing Doc. 45 at Count XI)).

ADPS essentially makes three arguments in support of its Motion for Summary Judgment:  (1) neither Walker nor Smith-McKenzie is able to establish his or her status as an "employee" of ADPS under Title VII; (2) a presumption exists that ADPS and the Sheriff's Department are distinct entities and that ADPS is not an agent of the Sheriff's Department under Alabama law; and (3) regarding retaliation, neither Walker nor Smith-McKenzie is able to establish that ADPS took an adverse

employment action against him or her.

### 1.    ADPS's Potential Liability Under Title VII

ADPS's primary basis for summary judgment is that it falls outside any potential employer-related liability under Title VII with respect to both Smith-McKenzie and Walker.  Plaintiffs respond that they have adduced sufficient evidence from which a reasonable jury could conclude that ADPS employed them as either a (1) single employer, (2) a joint employer, or (3) an agent.  (Doc. 139 at 14).  More specifically, in opposing summary judgment, Plaintiffs set forth the following Eleventh Circuit standard on the meaning of "employee" under Title VII:

> In determining who is an "employee," the Eleventh Circuit has adopted the hybrid "economic realities" test:
>
>> Under this test, the term ""employee"" is ""construed in light of general common law concepts"" and ""should take into account the economic realities of the situation,"" ""viewed in light of the common law principles of agency and the right of the employer to control the employee."" *Id.*  Specifically, the court should consider factors such as whether the defendant directed the plaintiff's work and provided or paid for the materials used in the plaintiff's work.  *Id.* at 341.
>
> *See Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004), citing *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340-41 (11th Cir. 1982).  Specifically, it is "the right of the employer to control the employee that [is] determinative." *Cobb*, 673 F.2d at 341.

(Doc. 139 at 15).  Plaintiffs then argue that, even though they admittedly received no

28

compensation from ADPS, they have provided sufficient evidence to show that they were direct employees of ADPS.  (*Id.* at 15-16).

Alternatively, Plaintiffs oppose summary judgment on the basis that ADPS is subject to liability under Title VII because it operated as either a joint employer or an agent with respect to the Sumter Defendants:

> This distinction is important because, in *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291, (11th Circuit 1988), the Eleventh Circuit Court of Appeals made plain that "[i]t is clear from the language of the statute that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." *Zaklama*, 842 F.2d at 294.

(Doc. 139 at 17-18; *id.* at 17 ("[E]ven if the [A]DPS is found not to be a direct employer, Plaintiffs' claims do not fail as they have specifically ple[]d that the [A]DPS acted as her employer and/or **joint employer** and/or **agent** of the co-defendants within the meaning of Title VII.")).

Both sides also point the court to the Eleventh Circuit's decision in *Lyes v. City of Riviera Beach*, 166 F.3d 1332 (11th Cir. 1999), in addressing ADPS's potential liability under Title VII.  In *Lyes*, as the Eleventh Circuit summarized the scope of the term "employer" under Title VII:

> We have identified three circumstances in which it is appropriate to aggregate multiple entities for the purposes of counting employees. First, where two ostensibly separate entities are "'highly integrated with respect to ownership and operations,'" we may count them together

29

under Title VII. *McKenzie*, 834 F.2d at 933 (quoting *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala.), *aff'd*, 664 F.2d 295 (11th Cir. 1981)). This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. *See Virgo*, 30 F.3d at 1359-60. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. *See Williams*, 742 F.2d at 589. This is the "agency" test. *See generally* 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1309-17 (3rd ed.1996).

*Lyes*, 166 F.3d at 1341.[23]

As summarized, Plaintiffs characterize the evidence upon which they rely to show ADPS's potential liability to them under Title VII to include: "(1) it acted as the EEO branch for the Plaintiffs, both in receiving and being assigned to investigate complaints of sexual harassment by Smith-McKenzie, (2) it directed disciplinary action towards Walker via Agent Huggins's instructions to Sheriff Hatter resulting in Walker being placed on administrative leave,[24] and (3) as a result of the

---

[23] The standards subsequently enunciated by the Eleventh Circuit in *Lyes* were expressly limited to the single employer test. 166 F.3d at 1341 n.4 ("In any event, we do not decide any agency issues, because the panel did not reach them, *see* 166 F.3d at 1385 n.6, and we limited our briefing request to the 'single employer' issue.").

[24] More specifically as noted above in the fact section, Sheriff Hatter testified that Walker was put on leave at the direction of ADPS Agent Huggins during the extortion investigation. (Doc. 133 at Ex. E at 51- 52).

30

investigation conducted by the [A]DPS and its ongoing communications with Sheriff Hatter during the investigation, Walker's employment was terminated." (Doc. 139 at 16).

From a preliminary standpoint, the court agrees with ADPS that whether Plaintiffs' Title VII claims survive against it turns upon an evaluation of whether the evidence can support the submission of an agency theory of employer liability to a jury. (Doc. 134 at 10 ("The basis of the plaintiffs' claims against [A]DPS is therefore apparently made upon allegations that although the plaintiffs were never actual employees of [A]DPS, that [A]DPS acted as an agent for the Sumter County Sheriff's Office in employment matters and that [A]DPS and the Sumter County Sheriff's Office should thus be treated as a single entity for Title VII liability purposes."); Doc. 86 at 3 ("Both parties agree that [A]DPS was not an employer, however they dispute whether the [A]DPS is an agent of the Sheriff's Department.") (emphasis added)).

More specifically, the court finds insufficient evidence to support any direct employee-employer Title VII relationship under the economic realities test, especially given the lack of any compensation or other funding provided by ADPS to Plaintiffs or adequate proof that ADPS exercised any control over how Plaintiffs worked. Also, in the absence of a high integration of ownership and/or operations between ADPS and the Sheriff's Department, Plaintiffs lack sufficient proof to show a single

31

employer relationship between the entities under Title VII as a matter of law.

Further, with no contractual relationship between ADPS and the Sheriff's Department and no evidence that ADPS exercised sufficient control over the terms and conditions of employment of Plaintiffs as employees of the Sheriff's Department, Plaintiffs also do not meet the joint employer test as summarized in *Lyes*. *See also Llampallas v. Mini-Circuits, Lab., Inc.*, 163 F.3d 1236, 1244 (11th Cir. 1998) (noting that single employer and joint employer doctrines "concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based"). Therefore, summary judgment in favor of ADPS is due to be entered as to Plaintiffs' direct, single, and joint employer theories of Title VII liability on the basis of a failure of sufficient proof.

As for Title VII agency liability, ADPS compares its creation under Alabama law (Ala. Code § 32-2-1) to that of the Office of Sheriff (§ 138, Constitution of Alabama of 1901 as amended by Amendment No. 35), and points to *Lyes* for the proposition that "a presumption exists that ostensibly distinct governmental entities are not the same employer under Title VII." (Doc. 134 at 11). *Lyes* does contain language that lends possible persuasive support to ADPS's position. As the Eleventh Circuit explained in *Lyes* , "[w]e think that where a state legislative body creates a public entity and declares it to be separate and distinct, that declaration should be

32

entitled to a significant degree of deference, amounting to a presumption that the public entity is indeed separate and distinct for purposes of Title VII." 166 F.3d at 1333.

However, the scope of the holding in *Lyes* does not on its face apply to either the joint employer or agency theories of liability under Title VII. More specifically, the standards subsequently enunciated by the Eleventh Circuit in *Lyes* were expressly limited to the single employer test. 166 F.3d at 1341 n.4 ("In any event, <u>we do not decide any agency issues</u>, because the panel did not reach them, *see* 126 F.3d at 1385 n.6, and we limited our briefing request to the 'single employer' issue.") (emphasis added). Instead, as the Eleventh Circuit specifically held, "two or more state or local governmental entities <u>will be treated as a single 'employer' under Title VII</u> where one entity exerts or shares control over the fundamental aspects of the employment relationships of another entity, to such a substantial extent that it <u>clearly outweighs the presumption that the entities are distinct</u>." 166 F.3d at 1345 (emphasis added).

Neither side has pointed to (nor has this court been able to independently locate) a controlling decision in which the *Lyes* holding has been extended to either the joint employer or agency theories of liability under Title VII. Therefore, it appears that how the Eleventh Circuit would evaluate either joint employer or agency liability involving state agencies under Title VII, including whether and/or the degree

33

to which a presumption of state entity distinctiveness would apply, is still an open question.

Moreover, while ADPS points to *Mack v. Alabama Dept. of Human Resources*, 201 F. Supp.2d 1196 (M.D. Ala. 2002) as instructive on the issue of agency liability and the application of *Lyes*, the actual language used by Judge DeMent in *Mack* is more limiting:  "The court concludes that each of the three governmental entities <u>can be regarded as a single employer</u> in the present circumstances."  *Id.* at 1202-03 (emphasis added); *see also id.* at 1203 ("The court is satisfied that there is <u>a sufficient degree of interrelationship between the respective entities in these circumstances</u> to conclude that there is at least a jury question as to the issue of whether or not they were all Mack's employer for purposes of Title VII.") (footnote omitted) (emphasis added).

In his memorandum opinion (Doc. 86) entered on July 28, 2003, Judge Coogler, a judge previously assigned to this case, addressed the application of *Lyes* at the Rule 12(b)(6) stage.  In his decision, Judge Coogler drew no distinction about *Lyes*'s focus on the single employer issue and simply concluded:

> Although the defendant correctly points out that the plaintiffs must rebut the presumption that the State of Alabama structured the Sheriff and the [A]DPS as separate entities [as held in *Lyes*], the court does not believe that the plaintiffs must rebut that presumption at this stage in the litigation.  Accordingly the motion to dismiss is denied.

34

(Doc. 86 at 8).

The undersigned is persuaded that, while the Eleventh Circuit's holding in *Lyes* is expressly limited to the single employer test, it is appropriate to extend its analysis to the alternative bases of joint employer and agency liability.  As Judge DeMent noted in summarizing *Lyes*, "[t]he Eleventh Circuit has held that, <u>out of concerns of comity</u>, courts are to respect the intricacy with which state governments structure their regimes; accordingly, there is to be a presumption that ostensibly distinct entities are not the same employer under Title VII."  *Mack*, 201 F. Supp. 2d at 1202 (emphasis added).  This court sees no reason (nor have Plaintiffs suggested one) why concerns of comity and federalism should not apply equally in the context of either joint employer and/or agency liability under Title VII.

Accordingly, this court extends the holding in *Lyes* that a presumption exists to treat governmental subdivisions separately to also apply to these additional theories of employer liability under Title VII.  Relatedly, a plaintiff may overcome this presumption by producing evidence from which "the fact finder reasonably could conclude the plaintiff has *clearly* overcome the presumption."  *Lyes*, 166 F.3d at 1345.

Now the court addresses the application of *Lyes* in the context of this particular case.  As a threshold matter, there is no dispute that ADPS is distinct from the

35

Sheriff's Department.  Second, with respect to Plaintiffs' single employer and joint employer theories, because the court has already concluded that the evidence is lacking even in the absence of any presumption in favor of distinctive treatment, then, *a fortiori*, Plaintiffs have not produced evidence to <u>clearly</u> overcome this presumption favoring separate treatment.  Accordingly, summary judgment in favor of ADPS is alternatively appropriate on the single and joint employer liability theories due to the *Lyes* presumption of distinctiveness and Plaintiffs' related inability to overcome it.

Now the court considers Plaintiffs' agency theory.  While acknowledging the closeness of the call, the court concludes "[v]iewing the totality of the circumstances" that Plaintiffs have not adduced sufficient evidence from which "the fact finder reasonably could conclude the plaintiff has *clearly* overcome the presumption" that ADPS, as a separate state entity, was not operating as an agent of the Sheriff's Department.  *Lyes*, 166 F.3d at 1347, 1345.

More specifically, Plaintiffs have not sufficiently shown any clear delegation of authority by the Sheriff's Department to ADPS of "traditional rights over employees[.]" *See Lyes*, 166 F.3d at 1341 (citation omitted); *see also Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984) ("'Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the

36

agency relationship.'") (citation omitted).[25]

In particular, the handling of the extortion investigation by ADPS and the suggestion that Walker be placed on administrative leave during the process does not establish a clear delegation of authority to ADPS.   Similarly, ADPS's related consideration of Smith-McKenzie's allegations of sexual harassment against Sheriff Hatter does not clearly establish a sufficient delegation.   For example, the record does not show that the Sheriff's Department delegated any final decision-making authority on how to treat Plaintiffs based upon the results of the investigative work conducted by ADPS.

The *Lyes* court explained a plaintiff's burden to overcome the distinctiveness presumption as follows:

> The adverb "clearly," which derives from the federalism concerns we have discussed, is meant to be limiting. It is a thumb on the scale, and sometimes it will be decisive because federalism concerns should sometimes be decisive.  Absent evidence of evasive purpose, in order to survive a motion for summary judgment, a plaintiff will have to show that a reasonable fact finder could conclude that the presumption of distinctness is clearly outweighed.

---

[25] In *Williams*, the Eleventh Circuit affirmed the district court's determination that the Montgomery City-County Personnel Board  (the "Board") operated as an agent of the employing entity, the City of Montgomery (the "City"), within the meaning of Title VII.   *Id.* at 588-89.   As the Eleventh Circuit explained, and significantly unlike the situation here, Alabama law expressly "grants the Board rights traditionally reserved to the employer[.]"  *Id.* at 589.

*Lyes*, 166 F.3d at 1345-46.  As the evidence relied upon by Plaintiffs to show ADPS

as a Title VII agent of the Sheriff's Department does not "clearly outweigh" the

presumption of the entities' separateness, summary judgment in favor of ADPS on all

of Plaintiffs' claims against it in this particular capacity is also appropriate.

### 2.    Plaintiffs' retaliation claims against ADPS

As an alternative basis for summary judgment, ADPS, (citing to *Burlington*

*Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) and other cases) contends

that Plaintiffs cannot establish a *prima facie* case of retaliation.   In *Burlington*

*Northern*, the Supreme Court held regarding retaliation under Title VII:

> We conclude that the anti-retaliation provision does not confine
> the actions and harms it forbids to those that are related to employment
> or occur at the workplace.  We also conclude that the provision covers
> those (and only those) employer actions that would have been materially
> adverse to a reasonable employee or job applicant.  <u>In the present
> context that means that the employer's actions must be harmful to the
> point that they could well dissuade a reasonable worker from making or
> supporting a charge of discrimination.</u>

*Id.*, 548 U.S. at 57 (emphasis added).  Prior case law in the Eleventh Circuit limited

the foundation of retaliation claims to treatment amounting to adverse employment

actions.  Accordingly, the *prima facie* elements for retaliation under Title VII pre-

*Burlington Northern* were proof of: "(1) statutorily protected expression; (2) . . . an

adverse employment action; and (3) . . . a causal connection between the two events."

38

*Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

The Eleventh Circuit has explained the impact of *Burlington Northern* on the second *prima facie* element to a Title VII retaliation claim as:

> [T]he Supreme Court has defined an adverse employment action in the context of a retaliation claim as an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Wallace v. Georgia Dept. of Transp.*, 212 Fed. Appx. 799, 802 (11th Cir. 2006) (citation omitted). Accordingly as reformulated post-*Burlington Northern*, "'[t]o establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.'" *Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (citations omitted).

Additionally, *Burlington Northern* reaffirms the more general principle that, for an action to be retaliatory, it must be taken or decided by an employer. *Id.* at 63-64. As the Supreme Court explained:

> An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace. *See, e.g., Rochon v. Gonzales*, 438 F.3d, at 1213 (FBI retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (C.A. 10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who

complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).

*Burlington Northern*, 548 U.S. at 63-64 (emphasis added).

To the extent that ADPS is properly considered a Title VII employer of Plaintiffs by virtue of its role as an agent,[26] the evidence shows that it engaged in the following actions against them:  conducting an investigation into the reported extortion claim as to both Smith-McKenzie and Walker, and suggesting that Walker be put on administrative leave during the course of the extortion investigation.[27]  With respect to its investigation, the court agrees with ADPS that merely conducting an investigation in the context of an asserted extortion claim does not meet the *Burlington Northern* material adversity standard.  (Doc. 134 at 28); *see also*

---

[26]   The court limits its discussion here to ADPS's potential role as an agent under Title VII because it is the one alternative employer liability theory with the most merit as analyzed in Section IV.A.1, *supra*.

[27]   While Plaintiffs also argue that ADPS is an employer for the purposes of Walker's firing and Smith-McKenzie's constructive discharge claims (Doc. 139 at 32-34), the evidence in the record does not sufficiently establish ADPS's role as an agent with respect to these particular employment actions.  More specifically, at most the record shows ADPS's involvement as a potential agent of the Sheriff's Department with respect to its actions and recommendations <u>relating to its investigation of the extortion claim only</u>.

*Burlington Northern*, 548 U.S. at 69 ("'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'") (citation omitted); *id.* ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.").

Moreover, Plaintiffs have not shown that the manner in which ADPS conducted its investigation was somehow "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination[.]" Additionally, just because the ABI investigation was unpleasant for Plaintiffs does not make it materially adverse. As the *Burlington Northern* Court explained: "We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" 548 U.S. at 68 (citations omitted).

As to Walker's administrative leave <u>with pay</u>, ADPS's mere recommendation that the Sheriff's Department take this action during the pendency of the extortion investigation, without more, is similarly not "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of

41

discrimination[.]" First, Walker did not lose any pay as a result of the implementation of this recommendation. Second, there is no evidence to show that ADPS singled out Walker in making this suggestion, but rather made it recognizing the potential difficulties in keeping Walker on the job as a deputy sheriff during the course of the extortion investigation, including what role, if any, Walker played. Third, Sheriff Walker was the final authority on the decision to place Walker on administrative leave, and to the extent that any material adversity does flow, it does so from the point in which the administrative leave took effect, an action taken by Sheriff Hatter. Therefore, summary judgment is alternatively and independently appropriate in favor of ADPS on Plaintiffs' retaliation claims due to their inability to satisfy the *Burlington Northern* material adversity standard <u>as to its actions as a purported agent of the Sheriff's Department</u>.

## B.    Sumter Defendants' Motion for Summary Judgment

The Sumter Defendants' Motion for Summary Judgment is due to be granted in part and denied in part as explained more fully below.

### 1.    The Sheriff's Department

The Sumter Defendants' Motion for Summary Judgment notes that the Sheriff's Department is not an entity against which suit may be properly brought. Plaintiffs respond that they agree, that their most recently amended complaint does not assert

any claims against the Department (Doc. 45), and that, therefore, the point is moot. (Doc. 141 at 25 n.4). However, records from the clerk's office still show the Sheriff's Department as an active defendant. Accordingly, a dismissal in favor of the Sheriff's Department is due to be granted as a matter of law as unopposed and with Plaintiffs' consent.

### 2.      The County and the Commission

The County and the Commission contend that they are improper parties to all of Plaintiffs' claims for three reasons:

> First, the county sheriff is an executive officer of the state, not an employee of the county or the county commission. *Turquitt v. Jefferson County, Ala.*, 137 F.3d 1285, 1288 (11th Cir. 1988). Secondly, as an alter ego of the sheriff, the deputy sheriff is also a state employee. *Etowah County Com'n v. Grant*, 2007 WL 704902, at *3 (Ala. Civ. App. 2007). Thirdly the county sheriff is responsible for supervising, hiring, and firing employees of the sheriff's department, not the county or the county commission. *Id.* at 1289.

(Doc. 136 at 5-6).

Plaintiffs initially respond that because they are not asserting any *respondeat superior* liability against the County and the Commission, the Sumter Defendants' reliance upon *Turquitt* is misplaced. (Doc. 141 at 25). Instead, Plaintiffs note they have alleged liability against the County and the Commission as "employers" under Title VII. In their opposition, Plaintiffs maintain that they have adduced sufficient

43

evidence to show that the County and the Commission were either an agent of the Sheriff's Department or qualify under the single or joint employer Title VII tests. (Doc. 141 at 28-32).

Plaintiffs also assert that their § 1983 claims against the County and the Commission are viable. Finally, Plaintiffs alternatively argue that the County and the Commission are necessary parties under Rule 19(a) of the Federal Rules of Civil Procedure with respect to any back pay and/or damage award. (Doc. 141 at 33-34).

### a.   Title VII

Plaintiffs have not adduced sufficient evidence to show that either the County or the Commission was their employer under either the single employer, joint employer, or agency test.[28] Additionally and independently, Plaintiffs have not presented evidence to satisfy the *Lyes* presumption of distinctiveness such that a "fact

---

[28] The court notes that while the case of *Manley v. Mobile County, Ala.*, 441 F. Supp. 1351, 1356 (S.D. Ala. 1977) found "sufficient economic ties between the county and the sheriff to allow a Title VII suit against the county to stand[,]" in a failure to hire gender discrimination lawsuit, in doing so, the court followed another district court's reasoning as applied in a pay discrimination case. *See id.* (citing *Howard v. Ward County*, 418 F. Supp. 494, 501 (D.N.D. 1976)). Moreover, *Manley* does not mention, much less apply (perhaps because of its age) either the single employer, joint employer or agency test, and in any event is not controlling on or persuasive to this court. "Budgetary power, in and of itself, does not establish the control necessary to treat the Sheriff and the Board as joint employers." *Bristol v. Board of County Com'rs of County of Clear*, 312 F.3d 1213, 1219 (10th Cir. 2002).

finder reasonably could conclude the plaintiff has *clearly* overcome the presumption."
*Lyes*, 166 F.3d at 1345.  The standards governing these determinations are set forth
in Section IV.A.1, *supra*.

More specifically, while Plaintiffs have pointed to bits and pieces of evidence
which link certain aspects of Plaintiffs' employment to the County and/or the
Commission, such examples, are for the most part, limited to financial operations
(*i.e.*, accounting systems; bank accounts; "payroll functions; changes in personnel
status; employee time and attendance records; employee leave, vacation and holiday
time; retirement; taxes; worker compensation claims; and medical insurance matters"
(Doc. 141 at 20)), and in particular do not demonstrate that the County and/or the
Commission had authority (real or de facto) over any employment decisions critical
to this case, such as participating in the firing of an employee of the Sheriff's
Department.

The Eleventh Circuit explained the needed nexus between the adverse
employment decision and the potential additional Title VII employer in *Llampallas*
as follows:

> In this case, that adverse employment decision was Llampallas'
> termination from her position as Production Supervisor at Mini-Circuits,
> and Palmetto had absolutely nothing to do with that decision. Palmetto
> had no interaction with Mini-Circuits employees. It made no decisions
> that affected the terms and conditions of employment at Mini-Circuits.

45

In fact, it was completely uninvolved in the operation of Mini-Circuits.

*Id.*, 163 F.3d at 1245 (footnote omitted) (emphasis added).

Similarly, Plaintiffs have failed to connect any role that the County and/or the Commission had over their employment to the specific actions about which they complain (*i.e.*, retaliation, discrimination, discharge, and harassment). Put differently, application of the single employer, joint employer, and agency concepts under Title VII turns not only upon the entities' relationships but also the nature of the type of employee claim at issue. Finally, even assuming the evidence presented by Plaintiffs would be sufficient to support single employer, joint employer, or agency liability, it would still otherwise be inadequate under *Lyes*, and the County and the Commission are entitled to summary judgment under Title VII for this alternative reason.

### b.    Section 1983

Regarding potential § 1983 liability of the County and the Commission, Plaintiffs rely upon *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005). The court does not find *Cooper* to be very helpful as it involves a discussion of when a police chief's actions may be attributable to a municipality under § 1983.[29]

---

[29] Likewise, *Cooper* does not address any of the potential nuances associated with a sheriff's serving as an employee of the state rather than a county.

As the Eleventh Circuit explained in *Welch v. Laney*, 57 F.3d 1004 (11th Cir. 1995), a case which included pay discrimination claims asserted pursuant to § 1983 against various commissioners for the actions of a sheriff regarding the plaintiff's compensation:

> This court has held a county liable under § 1983 for the personnel decisions of a sheriff where the sheriff acted as the "ultimate repository of county authority." *Parker v. Williams*, 862 F.2d 1471, 1480 (11th Cir. 1989). The Cullman County Commission could likewise be liable for the acts of Sheriff Laney if Laney acted as the "ultimate repository of county authority."
>
> . . .
>
> Defendants argue that this court's decision in *Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989) is fatal to Welch's § 1983 claims against the commissioners. We disagree. In *Terry*, this court refused to hold a county commission liable for the hiring and firing practices of the county sheriff. *Terry*, 866 F.2d at 379. However, the basis for that holding was the county commission's lack of authority to hire or fire deputy sheriffs. The sheriff in *Terry* was statutorily empowered to hire and fire deputy sheriffs without the approval of the county commission; the county commission had no authority to hire or fire deputy sheriffs. *Id.* The sheriff in *Terry* could not have been acting as the "ultimate repository of county authority" delegated to him by the county because the county had no authority to delegate to the sheriff.
>
> In contrast, the Cullman County Commission is invested with the authority to set ranges of compensation for all county employees, including the employees of the Cullman County Sheriff's Department. 1980 Ala. Acts 80-549. This authority of the Cullman County Commission distinguishes this case from *Terry* because, unlike the Commission in *Terry*, the Cullman County Commission had authority to set salaries and could have delegated that authority to Sheriff Laney.

47

> Sheriff Laney could have been operating as the "ultimate repository" of
> the county's authority to set salaries.

*Welch*, 57 F.3d at 1009, 1010.

The Eleventh Circuit ultimately reversed the district court's "dismissal of Welch's §

1983 claims against the commissioners[.]" *Id.* at 1007.  Therefore, whether a sheriff

is operating as the "ultimate repository" of a county's authority depends upon the

nature of the claim (*i.e.*, hiring, firing, or supervising versus pay) and the specific

structuring of the authority between the county and the sheriff as to that particular

subject area.

Here, similar to *Terry*, the nature of Plaintiffs' § 1983 claims against the

County and the Commission are akin to firing and supervision within the Sheriff's

Department, rather than pay.  As the Supreme Court of Alabama explained in *Ex*

*parte Sumter County*, 953 So. 2d 1235 (Ala. 2006):

> Alabama law provides that a county commission does not have the
> authority, or the responsibility, to promulgate policies and work rules for
> employees of the sheriff's office, nor does a county commission have
> authority over law-enforcement policies or the training, supervision,
> hiring, or firing of the sheriff's employees. *See Crocker v. Shelby*
> *County*, 604 So.2d 350 (Ala. 1992). Consequently, Sumter County
> cannot be held liable for any action resulting from the hiring, training,
> or supervising of jail personnel.

*Ex parte Sumter County*, 953 So. 2d at 1238 (emphasis added).

If a commission has no such authority, as *Crocker* holds, then a sheriff, as a matter

of law, cannot serve as the "ultimate repository" of that non-existent county authority.

In their § 1983 analysis against the County and the Commission, Plaintiffs have not mentioned the holding in *Crocker*, much less distinguished it. Nor have Plaintiffs engaged in any "ultimate repository" discussion as Eleventh Circuit law requires much less explained why any of their evidentiary citations demonstrate how the Sheriff's Department and/or Sheriff Hatter is the "ultimate repository" of the County or the Commission's authority to fire or otherwise manage and supervise the employees that work for the Sheriff's Department. Therefore, for all these reasons, neither the County nor the Commission can be held liable pursuant to § 1983 for the types of unlawful employment practices allegedly engaged in by Sheriff Hatter.

### c.   Rule 19(a)

As this court recently stated in another case "[a] party is considered to be 'necessary' to the action if the court determines either that complete relief cannot be granted with the present parties, or the absent party has an interest in the disposition of the current proceedings." *See American Int'l Ins. Co. v. Schuler*, No. 2:08-CV-00976-VEH (Doc. 17 at 6) (N.D. Ala. Sept. 3, 2008) (citing *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir. 1999); Fed. R. Civ. P. 19(a)). Other than simply referencing Rule 19(a), Plaintiffs have cited to no authority which substantiates how the County and the Commission are necessary parties to this

49

litigation.  Nor has the court been able to independently locate a controlling case which would require either the County's or the Commission's presence solely because of Plaintiffs' concern over back pay or other monetary award issues.

As Defendants respond, "Sheriff Hatter has not proffered the argument that he was not the employer of either Plaintiff." (Doc. 145 at 5).  Further, Plaintiffs have not shown the potential for an inconsistent judgment or that the absence of either the County or the Commission somehow would deprive them from obtaining complete relief.  (*Id.*).  Therefore, Plaintiffs' alternative basis for keeping the County and the Commission in the litigation under Rule 19(a) is due to be denied.

### 3.   Sheriff Hatter

### a.   Section 1983 Official Capacity Claims

As the Eleventh Circuit made clear in *Carr v. City of Florence, Ala.*, 916 F.2d 1521 (11th Cir. 1990), in the absence of either congressional abrogation or waiver by a state "through legislative enactment[,]" a sheriff, as an employee of the state, cannot be sued via § 1983 in his official capacity for most types of claims, "except for injunctive actions" by virtue of Eleventh Amendment immunity.  *Carr*, 916 F.2d at 1524-25; *see also Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989) (holding that states and state officials acting in their official capacities are not "persons" subject to liability under 42 U.S.C. § 1983); *Cross v. State of Ala., State*

50

*Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995)

("The Eleventh Amendment bars appellees' section 1983 lawsuit for monetary

damages against Horsley, Poundstone, and Stricklin in their official capacities.");

*Malone v. Chambers County Bd. of Com'rs*, 875 F. Supp. 773, 782 (M.D. Ala. 1994)

("Thus, Malone's suit for damages under Section 1983 from [Sheriff] Morgan and

Lovelace in their official capacities is a suit against the State of Alabama and as such

it is barred by the Eleventh Amendment.").[30]

Plaintiffs do not challenge the Sumter Defendants' position that an official

capacity suit against Sheriff Hatter in this instance is one against the State of

---

[30] Regardless of the legal vehicle relied upon – § 1981, § 1983, or Title VII – the court analyzes the merits of Plaintiffs' claims under the same framework. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1314 n.6 (11th Cir. 2000) (explaining parallel treatment in analyzing discrimination claims by state actors and citing several controlling cases); *see also CBOCS West, Inc. v. Humphries*, __ U.S. __, 128 S. Ct. 1951, 1960 (2008) ("Third, CBOCS points out that § 1981, if applied to employment-related retaliation actions, would overlap with Title VII. This argument, however, proves too much. Precisely the same kind of Title VII/§ 1981 'overlap' and potential circumvention exists in respect to employment-related direct discrimination."). Moreover, neither side takes the position that the court should treat the elements to claims at issue here differently. *See Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1120 n.10 (11th Cir. 2001) ("We have previously noted that <u>whether the elements of Title VII and § 1981 retaliation claims are the same is an 'open question' in this Circuit</u>. *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1463 n.4 (11th Cir. 1998). However, <u>the parties have not raised or argued that issue before us, so we will not attempt to decide it now</u>. If the issue is raised and preserved on remand and survives the jury trial, it can be addressed in any subsequent appeal.") (emphasis added); *see generally Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405 (11th Cir. 1998).

51

Alabama.[31]  Therefore, summary judgment is due to be entered in favor of Sheriff

Hatter as to all claims for monetary relief against him in his official capacity.[32]

However, to the extent Plaintiffs are seeking prospective injunctive relief

against Sheriff Hatter in his official capacity, then those portions of their § 1983

claims remain.[33]  *See Carr*, 916 F.2d at 1524 n.2 (discussing prospective injunctive

---

[31] As explained by the Eleventh Circuit in *Abusaid v. Hillsborough County Bd.
of County Com'rs*, 405 F.3d 1298 (11th Cir. 2005), "[t]o determine whether the
defendant, while engaged in the relevant function, acts as an arm of the state, [the
court] conduct[s] a four factor inquiry, taking into account[:]"

> (1) how state law defines the entity; (2) what degree of control the state
> maintains over the entity; (3) the source of the entity's funds; and (4)
> who bears financial responsibility for judgments entered against the
> entity.

405 F.3d at 1303 (citation omitted).

[32] The court reads Plaintiffs' opposition to agree with this particular point on
summary judgment:  "Plaintiffs do not dispute the defendant's position with regard
to Eleventh Amendment immunity for Defendant Hatter only as to the ability to
collect monetary damages from same."  (Doc. 141 at 34).

[33] Similarly, as Plaintiffs point out, non-monetary relief exceptions also exist
regarding the defense of state immunity applicable to a sheriff.  (Doc. 141 at 35).  As
set forth in *Employees of the Montgomery Sheriff's Dept. v. Marshall*, 893 So. 2d 326
(Ala. 2004), these include as follows:

> [A]ctions brought (1) to compel him to perform his duties, (2) to compel
> him to perform ministerial acts, (3) to enjoin him from enforcing
> unconstitutional laws, (4) to enjoin him from acting in bad faith,
> fraudulently, beyond his authority, or under mistaken interpretation of
> the law, or (5) to seek construction of a statute under the Declaratory

relief exception to Eleventh Amendment immunity) (citations omitted); *Cross*, 49 F.3d at 1503 (same).[34]  Relatedly, and as Plaintiffs correctly point out, any "monetary relief, including costs, which is ancillary to such prospective relief" also remains potentially viable.  (Doc. 141 at 34 (citing *Kentucky v. Graham*, 473 U.S. 159, 169 n.18 (1985)).

### b.   Section 1983 Individual Capacity Claims

The Sumter Defendants have raised the defenses of qualified immunity and state immunity "as defense against Plaintiffs' claims"[35] against Sheriff Hatter in his

---

Judgment Act if he is a necessary party for the construction of the statute. . . ."

*Marshall*, 893 So. 2d at 330 (citation omitted).

[34] As presently pled, Plaintiffs' request for injunctive relief is primarily lumped together in an unhelpful fashion at the end of the complaint.  (Doc. 45 § IV at 45). Further, in opposition to summary judgment, Plaintiffs only generally mention that they are entitled to "an injunction, reinstatement, and a predetermination hearing" without referencing any particular counts.  (Doc. 141 at 35).  Because Plaintiffs' complaint, status report, and brief do not make entirely clear which, if any, counts would fall within their claim for prospective injunctive relief , the court will require Plaintiffs to clarify, as part of the pretrial order process, in a non-shotgun format, the contours of each claim and any corresponding relief sought set out separately, that remains in the case for trial as a result of this decision on summary judgment.

[35] In naming this particular heading of their brief, the Sumter Defendants state that "**SHERIFF HATTER IS ENTITLED TO AN IMMUNITY DEFENSE TO BAR PLAINTIFFS' CLAIMS AGAINST HIM IN HIS INDIVIDUAL CAPACITY.**"  (Doc. 136 at 16).  However, as best as this court can decipher, the text of this section appears to actually raise two immunity defenses (*i.e.*, state immunity

individual capacity.  (*See generally* Doc. 136 at 16-20; *id.* at 18).  Regarding state immunity, in particular, the Sumter Defendants state that "[a] claim for monetary damages made against a constitutional officer in the officer's <u>individual</u> capacity is barred by State immunity whenever the acts that are the basis of the alleged liability were performed within the course and scope of the officer's employment." (*Id.* at 17).  However, in presenting these defenses, the Sumter Defendants have only specifically pointed to two particular employment actions in which Sheriff Hatter "was acting within the line and scope of his discretionary authority [or, alternatively, the course and scope of his employment.]" (Doc. 136 at 18).

One relates to the firing of Walker (*see id.* ("Sheriff Hatter was acting within the line and scope of his discretionary authority when he terminated Plaintiff Walker as deputy sheriff.")); the other pertains to the constructive discharge of Smith-McKenzie.  (*See id.* at 19-20 ("As such, Plaintiff Smith-McKenzie's constructive discharge is also well within the sheriff's discretionary functions."); *see also id.* at 20 ("Plaintiffs cannot overcome these principles, or overcome the Court's recognition of hiring and firing as  a discretionary function, simply by alleging racial or sex discrimination.")).  Further, as the Sumter Defendants conclude their state/qualified

---

in addition to qualified) instead of just a singular "immunity defense" to claims against Sheriff Hatter is his <u>individual capacity</u>.

immunity argument by stating, "[i]sofar as Plaintiffs allege that their damages arise from their termination and/or constructive discharge by Sheriff Hatter, his actions were well within his statutory duty to oversee the jail and its employees." (Doc. 136 at 20). Accordingly, the court limits its analysis of any immunity defense to Sheriff Hatter's involvement in Walker's dismissal and Smith-McKenzie's constructive discharge only.[36] The court first addresses qualified immunity.

## **General Principles Governing Qualified Immunity**

Qualified immunity is a defense available to law enforcement officers (as well as other state actors) and is designed to greatly limit litigation against such persons in their individual capacities. Indeed, the defense is so broad that only those officers who are "plainly incompetent or those who knowingly violate the law" are required to defend against individual liability claims. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The purpose of qualified immunity is, "to ensure that before they are subjected to suit, [law enforcement] officers are on notice [that] their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

For individual defendants, qualified immunity utilizes an "'objective

---

[36] Therefore, because Sheriff Hatter does not seek qualified immunity with respect to Smith-McKenzie's sexual harassment allegations, the court is not called upon and does not reach the scope of any qualified or state immunity defense as applied to that particular alleged conduct.

55

reasonableness' standard, giving a government agent the benefit of the doubt unless [his] actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them." *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998).   As the Eleventh Circuit has summarized, "'the salient question . . . is whether the state of the law [at the time of the events in question] gave [the deputy] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional.'" *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Once a defendant has raised the defense of qualified immunity and has met the burden of showing that his or her actions were within the scope of discretionary authority, then the plaintiff has the burden to overcome the defense.   More specifically, the Eleventh Circuit recognizes the following two-part analysis for qualified immunity claims:

> 1.  The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

> 2.  Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part.  This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (citing *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)) (other citations omitted); *see also Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) ("The Supreme Court has established a two-part test [that pertains to the plaintiff's burden in] evaluat[ing] whether an official is entitled to qualified immunity.  First, as a threshold inquiry, we address whether the facts presented, taken in a light most favorable to the non-moving party, establish a constitutional violation. If we answer this question in the affirmative, then we 'ask whether the right was clearly established.'") (internal and other citations omitted).

Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law with respect to this case.  *Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose.").   Furthermore, there is a temporal requirement related to the clearly established law inquiry.  More specifically, a plaintiff must show that a reasonable public official would not have believed his actions to be lawful in light of law that was clearly established at the time of the purported violation. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (explaining that qualified immunity assessment is made "in light of the legal rules that were 'clearly established' at the time [the challenged

57

action] was taken") (citation omitted); *Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

### Application of Qualified Immunity

In responding to Sheriff Hatter's qualified immunity defense, Plaintiffs do not contest the Sumter Defendant's position that Sheriff Hatter was acting within his discretionary authority when he terminated Walker's employment and constructively discharged Smith-McKenzie. (*See generally* Doc. 141 at 36-37). Accordingly, with that concession, the burden shifts to Plaintiffs to show that Sheriff Hatter violated clearly established law.

Assuming without deciding that Sheriff Hatter's actions regarding Walker's dismissal and/or Smith-McKenzie's constructive discharge could be considered unconstitutional, Plaintiffs have not demonstrated,[37] by clearly established law, that

---

[37] Nor has the court's own independent research substantiated satisfaction of the clearly established standard under this set of facts. For instance, while the Eleventh Circuit recognized in *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1305 (11th Cir. 2005), that the case of *Poole v. County Club of Columbus, Inc.*, 129 F.3d 551 (11th Cir. 1997) "provides fair warning" to public officials of certain actions which can constitute constructive discharge, that degree of evidence does not exist in this case. *See Poole*, 129 F.3d at 553 ("Stripped of all responsibility, given only

Sheriff Hatter would have been on notice of his illegal conduct.  More specifically, none of the cases cited by Plaintiffs to show fair warning involve facts significantly comparable to the ones in this case.  *See Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998) ("The Supreme Court and this court have stated that a plaintiff cannot strip a § 1983 defendant of h[is] qualified immunity by citing to general rules or abstract rights.  'Qualified immunity focuses on the <u>actual, specific details of concrete cases</u>.'") (emphasis added) (internal and other citations omitted).  The court addresses each fair warning case cited by Plaintiffs in turn.

Plaintiffs' reference to sexual harassment and the *Cross* case are not pertinent as Sheriff Hale has not moved for qualified immunity as to this particular claim. Plaintiffs' citation to the case of *Hobson v. Pow*, 434 F. Supp. 362 (N.D. Ala. 1977) cannot show any clearly established law as it is a district court opinion addressing the constitutionality of a law that resulted in the plaintiff being "removed from the list of registered voters in Bibb County and was disqualified from voting or standing as a candidate for public, elective office in Alabama because he had been convicted of assault and battery on his wife, a misdemeanor charge."  434 F. Supp. at 366.  The Hobson decision turned upon the court's evaluation of a citizen's "constitutionally

---

a chair and no desk, and isolated from conversations with other workers, Poole has presented evidence suggesting that a reasonable person might find the conditions under which she was working intolerable.") (emphasis added).

protected right to participate in elections on an equal basis with other citizens in the jurisdiction" and equal protection considerations applicable to "gender-based classifications[.]" *Id.* (citations omitted).

Further, while the case of *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991) does address qualified immunity in the context of race discrimination allegations,[38] procedurally it involves a motion to dismiss versus summary judgment, and therefore is not particularly instructive when the court is trying to assess the impact of an articulated, legitimate explanation for an adverse employment decision (*i.e.*, here, the stated reason of Walker's admitted untruthfulness during the ABI criminal investigation) in either a *McDonnell Douglas/Burdine* framework and/or in a potential mixed-motive case on a qualified immunity defense.[39]

_____

[38] In particular, *Brown* recognizes that "[i]t is beyond doubt that the principal right allegedly violated by the defendants-the equal protection right to be free from intentional racial discrimination-was clearly established at the time Cochran and Hoffman fired Brown." 923 F.2d at 1478. As the court later states regarding qualified immunity at the Rule 12(b)(6) stage, "Brown's complaint, as the district court recognized, alleges sufficient facts to foreclose a finding of immunity for Cochran at this juncture[,]" and "[t]he allegations concerning what city manager Hoffman knew or should have known about the discriminatory treatment of Brown by the police department are, though expressed in very few words, sufficient to withstand a motion to dismiss." *Id.* at 1479. It is also worth noting that *Brown* involves a pro se plaintiff. *Id.* at 1475.

[39] *See, e.g., Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269 (11th Cir. 2008), a mixed-motive race discrimination case in which the Eleventh Circuit held:

Finally, Plaintiffs have not cited to even one constructive discharge case.

Instead, Plaintiffs' opposition speaks in generalities about how a reasonable official in Sheriff Hatter's position "would have known that his actions taken against the Plaintiffs, *i.e.*, sexual harassment, sex discrimination and racial discrimination,

---

The trial court below addressed the next step in the qualified immunity analysis by noting that there was no real dispute that the right to be free from employment discrimination was clearly established at the time of Rioux's demotion. As a general principle, we can all agree with that statement. . . .

We therefore turn to an examination of "whether the defendant's conduct was nonetheless 'objectively reasonable' in light of that [Equal Protection] right." *Johnson*, 126 F.3d at 1378 (citing *Anderson*, 483 U.S. at 638, 107 S. Ct. 3034). Rioux must demonstrate at this step in the qualified immunity analysis that a reasonable fire chief and a reasonable chief operating officer of a city would know that demoting a high-ranking, subordinate, discretionary officer in the factual circumstances presented here violated clearly established law. *See Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1294 (11th Cir. 2000) (citing *Harlow*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed.2d 396). And it is this that he cannot show.

*Rioux*, 520 F.3d at 1283 (emphasis added). Therefore, in *Rioux*, even though the plaintiff had "presented a *prima facie* case of discrimination and showed sufficient evidence of pretext," his individual capacity claims under § 1983 were still due to be dismissed "[b]ecause pre-existing law did not provide fair warning to Appellees that demoting Rioux under these circumstances would violate clearly established federal law, Appellees are entitled to qualified immunity." *Id.* at 1271, 1285. As the *Rioux* court explained why mixed-motive analysis applied there: "Viewing the facts in the light most favorable to Rioux, Appellees had adequate lawful reasons to support their decision to demote Rioux, and may have had improper race-based motives to take the challenged action as well." *Id.* at 1283.

violated clearly established law." (Doc. 141 at 37).  This is an insufficient manner in which to oppose a qualified immunity defense at the summary judgment stage. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)). "[T]he onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted).  Relatedly, it is not this court's responsibility to independently satisfy either side's respective burden on supporting or opposing a qualified immunity defense.

Therefore, Plaintiffs have failed to carry their burden on qualified immunity at the summary judgment stage concerning Walker's dismissal and Smith-McKenzie's constructive discharge.  Accordingly, summary judgment is due to be entered in favor of Sheriff Hatter as to any claims asserted against him in his individual capacity that are predicated upon these adverse employment actions.

## State Immunity

In assessing the state immunity defense to claims against Sheriff Hatter in his individual capacity, the court reaches the same result as with qualified immunity given the same evidence at issue and the similar legal analysis involved.  As noted *supra,* the Sumter Defendants only clearly seek the application of state immunity for

62

Sheriff Hatter regarding his actions in dismissing Walker and in constructively discharging Smith-McKenzie.

In support of their state immunity argument, the Sumter Defendants cite to *Milton v. Espey*, 356 So. 2d 1201 (Ala. 1978).  (Doc. 136 at 16-17).  As *Milton* explains, "Section 14 of the Alabama Constitution [is the provision] which declares sovereign immunity."  *Id.* at 1201-02.

Regarding state officials, the *Milton* court further makes clear "Section 14 does not necessarily immunize State officers or agents from individual civil liability."  *Id.* at 1203.  As the *Milton* court more specifically explained:

> "While the State itself may not be made a party to such action, it does not necessarily follow that its officers, Ray Bass, Claude Kelley and Governor Wallace, in their respective capacities, are also immune. The essence of plaintiffs' complaint is that these officers of the State acted fraudulently, in bad faith, beyond their authority, or acted under a mistaken interpretation of the law. Such allegations bring this case within those not protected by Section 14 of the Constitution. *Wallace v. Board of Education of Montgomery Co.*, 280 Ala. 635, 197 So.2d 428 (1967); *Engelhardt v. Jenkins*, 273 Ala. 352, 141 So.2d 193 (1962); *Finnell v. Pitts*, 222 Ala. 290, 132 So. 2 (1930)." (Emphasis added.)

*Milton*, 356 So. 2d at 1203.  Therefore, whether state immunity applies to Sheriff Hatter depends upon an evaluation of the nature of the actions that he allegedly took regarding Plaintiffs.

In further support of the state immunity defense, the Sumter Defendants point

63

out that "Sheriff Hatter cannot be sued for acting within the line and scope of his employment, which includes hiring and firing employees," and further that "the administration and direction of employees is a discretionary act under Alabama law." (Doc. 136 at 17); *see, e.g., Nance v. Matthews*, 622 So. 2d 297, 301 (Ala. 1993) ("The decision whether or not to retain Garrett as an employee also requires the use of discretion."); *id.* ("This Court has held that the exercise of such [training and supervisory] functions is, for the most part, discretionary in nature, and to that extent, affords [the defendant supervisor] substantive [or qualified] immunity from suit, noting that [t]hese duties, while perhaps affirmative ones, require constant decision making and judgment on the part of the supervisor or trainer.") (internal quotations and citation omitted) (emphasis added); *id.* (citing *Hickman v. Dothan City Bd. of Educ.*, 421 So.2d 1257 (Ala. 1982) ("holding that the <u>decision not to retain a teacher for the next school year was a discretionary function for which the defendants possessed qualified immunity</u>")) (emphasis added). Therefore, the Sumter Defendants have met their initial burden on summary judgment with respect to Walker's dismissal and Smith-McKenzie's constructive discharge because state immunity immunizes Sheriff Hatter's dismissal of Walker and his constructive discharge of Smith-McKenzie because those actions involved discretionary functions.

64

In reviewing Plaintiffs' brief in opposition, the court does not see where they have specifically addressed Sheriff Hatter's state immunity defense to individual liability. (*See* Doc. 141 at 36-37 (limiting discussion to qualified immunity defense and citing only to federal cases)).  Therefore, Plaintiffs have neither challenged the discretionary nature of Sheriff Hatter's actions regarding Walker's dismissal and Smith-McKenzie's constructive discharge, nor otherwise disputed the application of state immunity with respect to either action.  Accordingly, Plaintiffs have failed to carry their burden in opposing the defense of state immunity concerning these particular employment actions, and summary judgment is alternatively due to be entered in favor of Sheriff Hatter as to any claims asserted against him in his individual capacity that are predicated upon Walker's discharge or Smith-McKenzie's constructive discharge.

Regarding Plaintiffs' other claims asserted against Sheriff Hatter in his individual capacity, because the Sumter Defendants have not identified them, much less discussed them in any detail, they have not shown that he was acting within the line and scope of his employment or in a discretionary capacity under Alabama law, much less met their burden on summary judgment that [Sheriff Hatter] is entitled to judgment in his favor as a matter of law [under state immunity]." *Milton*, 356 So. 2d at 1203.  Accordingly, any claims against Sheriff Hatter in his individual capacity

other than those premised upon Walker's dismissal and Smith-McKenzie's constructive discharge survive Sheriff Hatter's state immunity challenge to the extent that the defense has even been properly presented by the Sumter Defendants on summary judgment regarding those other claims.

### c. Title VII Claims

As Plaintiffs correctly note, the Eleventh Amendment does not bar Plaintiffs' right to seek Title VII claims against Sheriff Hatter in his official capacity as their employer. (Doc. 141 at 35). As recognized in *Malone* regarding Title VII and sovereign immunity:

> In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976), the Supreme Court addressed the question of whether the Eleventh Amendment shield of sovereign immunity protected a state and its officials from a suit for damages brought pursuant to Title VII of the Civil Rights Act. Id. at 447-448, 96 S. Ct. at 2667-2668. After recognizing the fact that Title VII was passed pursuant to Congress' authority under § 5 of the Fourteenth Amendment, the Court held that "the Eleventh Amendment, and the principle of state sovereignty which it embodies are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Id.* at 456, 96 S. Ct. at 2671. <u>Thus, the Eleventh Amendment is not a bar to Malone's claims under Title VII</u>. To the extent that Morgan and Lovelace base their Motion to Dismiss on Eleventh Amendment immunity from Title VII claims it is due to be DENIED.

*Malone*, 875 F. Supp. at 782 (emphasis added); *see also Cross*, 49 F.3d at 1502 ("It is undisputed that the Eleventh Amendment does not bar appellees' Title VII suit.")

66

(citation omitted).  Accordingly, the court now turns to the substantive grounds raised by the Sumter Defendants as to Plaintiffs' Title VII claims.

### Challenges to Walker's Title VII Race Discriminatory Discharge Claim[40]

In their initial brief, the Sumter Defendants attempt to assert only two substantive challenges to Walker's Title VII race discriminatory discharge claim. One, "Plaintiff Walker is unable to establish a *prima facie* case of race discrimination under Title VII."  (Doc. 136 at 20).  Two, "Sheriff Hatter asserts that he had legitimate, non-discriminatory reasons for taking the actions he took against Plaintiff Walker."  (Doc. 136 at 21).

As a preliminary matter, the court agrees with Plaintiffs that, from a Rule 56 initial burden standpoint, the Sumter Defendants' efforts on summary judgment as to Walker's Title VII termination claim against Sheriff Hatter are wholly lacking.  (Doc. 141 at 37 (citing *Fitzpatrick*, 2 F.3d at 1116 ("If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made.") (citation omitted) (emphasis added); *Dunmar*, 43 F.3d at 599 ("There is no burden upon the

---

[40]  The Sumter Defendants make no reference to Walker's Title VII retaliation claims and apparently do not seek summary judgment as to them.  (*See generally* Doc. 136 at 20-21 (limiting topic to improper termination based on race under Title VII only and making no mention of any Title VII retaliation asserted by Walker)).

district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)). "[T]he onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted).

By way of example only, the Sumter Defendants do not even set forth what the *prima facie* elements are for a Title VII race discrimination case, much less explain why Walker has not met them. Therefore, due to their failure to satisfy their initial burden as the movant, their Motion for Summary Judgment is due to be denied as to Walker's Title VII discrimination claim asserted against Sheriff Hatter. Relatedly, the court does not need to reach any analysis of the explanation proffered by Sheriff Hatter for his actions.

In any event and alternatively, the Sumter Defendants are wrong substantively. "A plaintiff establishes a *prima facie* case of discriminatory discharge by showing that: (1) he was a member of a protected class; (2) he was qualified for the job from which he was discharged; (3) he was discharged; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly situated individual outside his protected class." *Howard v. Oregon Television, Inc.*, 276 Fed. Appx. 940, 942 (11th Cir. 2008) (citation omitted). Here, the record reveals no factual disputes over Walker's race (*i.e.*, Caucasian), his qualifications for the position of Deputy Sheriff, his discharge, or his replacement by a non-Caucasian (*i.e.*,

68

Deputy Sheriff Horace Dish).

As for Sheriff Hatter's legitimate explanation for discharging Walker, the Sumter Defendants indicate that "Sheriff Hatter has offered testimony that he terminated Plaintiff Walker because he lied in a criminal investigation[.]" (Doc. 136 at 21; Doc. 137 at Ex. 26 at 79 ("When you don't tell the truth in a criminal investigation, it's hard to work a man in a court of law, put him on a witness stand.")). Apparently, this is the legitimate, non-discriminatory reason upon which they base their Motion for Summary Judgment, rather than the explanation given for Walker's dismissal as stated in his termination letter dated February 2, 2001: "Based on the investigation, I believe that you did aid Kim Smith [*i.e.*, Smith-McKenzie] by overseeing the wiring of the said Kim Smith so that she could secretly record the conversation between herself and me. <u>Therefore I don't feel I could ever trust you as a deputy sheriff</u>." (Doc. 137 at Ex. 6 (emphasis added)).

However, the record also shows that Sheriff Hatter did not discharge (or place on administrative leave) another non-Caucasian employee of the Sheriff's Department (*i.e.*, Sergeant Cottrell) who he also believed had been helping Smith-McKenzie with her sexual harassment allegations against him (*see* Doc. 137 at Ex. 26 at 91 ("Q. So do you believe it was Mr. Cottrell and Kim Smith who were making up these allegations of sexual harassment against you?  A.  Did I believe it?  Yes.")), and who

69

Sheriff Hatter also stated had testified untruthfully about him during his deposition. (*See id.* at 78 ("Q.  So when he (*i.e.*, Sergeant Cottrell) testified to that [*i.e.*, that Sheriff Hatter had threatened to fire Smith-McKenzie] yesterday, he was not telling the truth; is that right?  A.  When he said I threatened to fire Kim, no, he wasn't telling the truth.")).[41]  Plaintiffs are correct that such evidence, which discredits an employer's proffered explanation, is sufficient to show pretext.  As the United States Supreme Court explained pretext in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993):

> The factfinder' s disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination[.]

*Hicks*, 509 U.S. at 511 (footnote omitted).  Accordingly, the Sumter Defendants' Motion for Summary Judgment as to Walker's Title VII race discrimination claim against Sheriff Hatter is additionally due to be denied on the merits of their *prima facie* and pretext arguments <u>to the extent that they were even properly formulated for consideration by this court as explained *supra*</u>.

---

[41]  Sergeant Cottrell also holds a higher office within the Sheriff's Department than Walker did.

## Challenges to Smith-McKenzie's Title VII Claims

In their initial brief, the Sumter Defendants attempt to raise three challenges to Smith-McKenzie's Title VII claims.  One challenge is that they took no retaliatory action against her.  (Doc. 136 at 21-22).  Second, "[n]o evidence has been presented to show that her employment was so intolerable that Plaintiff Smith-McKenzie felt she had no choice but to leave."  (*Id.* at 22).  Third is that the alleged harassment by Sheriff Hatter against her does not meet the severe or pervasive prong of such a claim.  (*Id.* at 22-27).

Similar to the Sumter Defendants' total failure to frame their arguments for summary judgment on Walker's race discrimination claim, *see supra* at 67-68, on Smith-McKenzie's claims of retaliation and constructive discharge, they have again failed to set forth the *prima facie* elements of either claim, much less explain how Smith-McKenzie has failed to substantiate either theory.[42]  Therefore, due to their

---

[42]  The Sumter Defendants' one paragraph response on this area in their reply does not persuade the court any differently.  While the Sumter Defendants do set forth the *prima facie* elements of a retaliation claim, their position still lacks any cohesiveness.  (Doc. 145 at 11).  Not only do they fail to factually show how Smith-McKenzie's *prima facie* retaliation claim is deficient, but also they confusingly intermingle the elements of retaliation with other language that is seemingly applicable to constructive discharge, despite the fact that the heading clearly signals that the argument is limited to retaliation.  In sum, the court cannot understand what point the Sumter Defendants are trying to make and why Mary Gunn's knowledge *vel non* of Sheriff Hatter's alleged harassment of Smith-McKenzie matters when it is undisputed both that Smith-McKenzie otherwise reported it to other people and that

failure to satisfy their initial burden as the movants under Rule 56, their Motion for Summary Judgment is due to be denied as to Smith-McKenzie's retaliation and constructive discharge claims.

Additionally and alternatively from a merits standpoint, and to the extent the court can even follow the Sumter Defendants unformulated arguments, they ignore a plethora of material factual disputes and offer no mention, much less any analysis of the critical retaliation case of *Burlington Northern*, discussed *supra* in this memorandum opinion addressing ADPS's Motion for Summary Judgment, such that summary judgment is not appropriate as to either claim.[43]   In particular, as it pertains

---

Sheriff Hatter knew this.  In any event, waiting until the reply brief to first recite the *prima facie* elements of a claim on which summary judgment is being sought and otherwise untimely attempting to connect the dots as to why judgment as a matter of law is appropriate, is simply too little, too late under Rule 56.  This same rationale is equally true as to the Sumter Defendants' late and unpersuasive efforts in their reply brief to rehabilitate their flawed Motion for Summary Judgment on Walker's race discrimination claim as addressed *supra*, and Smith-McKenzie's harassment claim as discussed *infra*.

[43]   The court is well aware that establishing a triable issue on constructive discharge is far from automatic as the standard for proving it is "quite high" and "higher than the standard for proving a hostile work environment claim."  *See, e.g.*, *Hipp v. Liberty Nat'l. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (discussing general principles of constructive discharge claim) (citation omitted).   More specifically, "[t]o successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Id.* (citations omitted).  However, given the overall context of this case, a mere one sentence conclusory statement by the Sumter Defendants in support of summary judgment as to that claim

*Burlington Northern*, one of the specific examples of retaliatory conduct that the Supreme Court cited as properly actionable under Title VII's anti-retaliation provision included an employer who made false criminal charges against a former employee. *See Burlington Northern*, 548 U.S. at 64 (citing *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (10th Cir. 1996) ("finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination")). In this court's view, the factual similarity of *Berry* to the circumstances of this case is significant. As the Sumter Defendants have made absolutely no effort to explain how *Burlington Northern* or the cases cited with approval therein, such as in particular *Berry*, are distinguishable from the type of retaliation claim brought here (*i.e.*, Sheriff Hatter's seeking criminal extortion charges against Plaintiff Smith-McKenzie after she made sexual harassment complaints about him), Sheriff Hatter is not entitled to summary judgment on Smith-McKenzie's retaliation claim.

Turning to the Sumter Defendants' severe or pervasive argument as to Smith-McKenzie's sexual harassment claim, while they do cite some legal authority in

---

does not suffice.

support of their position in their initial brief,[44] they do not address the factual

substance of what Smith-McKenzie has testified that Sheriff Hatter did and said to

her. (Doc. 136 at 26). Their severe or pervasive challenge relates to Smith-

McKenzie's ability to establish one of the *prima facie* elements of a hostile work

environment sexual harassment claim:

> An employee asserting a claim of hostile working environment sexual
> harassment by an "employer" must prove the following in order to
> establish a prima facie case: (1) that the employee belongs to a protected
> group, *Henson*, 682 F.2d at 903; (2) that the employee was subject to
> "unwelcome" sexual harassment, *Vinson*, 106 S. Ct. at 2406; *Henson*,
> 682 F.2d at 903; 29 C.F.R. § 1604.11(a) (1985); (3) that the harassment

---

[44] One of the primary cases that the Sumter Defendants rely upon to support
their position on lack of severity or pervasiveness is the Eleventh Circuit's
unpublished decision in *Miller v. Lectra USA, Inc.*, 145 Fed. Appx. 315 (11th Cir.
2005). However because the opinion is an unpublished one, it is neither binding on
the Eleventh Circuit nor this court. *See Baker v. Birmingham Board of Education*,
531 F.3d 1336, 1338 (11th Cir. 2008) ("[B]ecause *Palmer* is an unpublished decision,
it is not binding precedent." (citing *Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co.,
Inc.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007); 11th Cir. Rule 36-2)). Therefore,
*Miller* is at most only persuasive authority. In any event, the court disagrees with the
Sumter Defendants that the Title VII cases upon which they rely (and in particular
those reported by the Eleventh Circuit) in an attempt to show that Smith-McKenzie
lacks a cognizable Title VII harassment claim, clearly involve "much more severe
conduct[.]" (Doc. 136 at 24 (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571 (11th
Cir. 2000), *abrogated on other grounds as recognized by Crawford v. Carroll*, 529
F.3d 961, 973-74 (11th Cir. 2008) ("Thus, the *Burlington* Court effectively rejected
the standards applied by this court in both *Stavropoulos* and *Gupta* that required an
employee to show either an ultimate employment decision or substantial employment
action to establish an adverse employment action for the purpose of a Title VII
retaliation claim.") (footnote omitted); *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th
Cir. 1990)).

complained of was based on sex, *Henson*, 682 F.2d at 903; and (4) that
the harassment complained of affected a "term, condition, or privilege"
of employment in that it was "sufficiently severe or pervasive 'to alter
the conditions of [the victim's] employment and create an abusive
working environment.'"

*Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir. 1987).

They also mistakenly limit Smith-McKenzie's testimony by stating that she

"alleges merely a few statements were allegedly made to her." (*Id.*). Instead, as

summarized by Plaintiffs, Smith-McKenzie's testimony regarding Sheriff Hatter's

treatment of her from August 2000 through October 2000, is much more extensive,

including: (1) telling Smith-McKenzie that she "looked good" and asking her to hug

his neck; (2) asking her for her home phone number; (3) telling her that there was just

something about her body build that he liked; (4) asking her to go out with him and

telling her that her mother was too old for him because he liked women between the

ages of 18 and 25; (5) repeatedly requesting her to call him and have phone sex with

him; (6) requesting her to call him from work on her night shift to have phone sex

with him; (7) suggesting to her that phone sex was not cheating and then explaining

to her that he and a lady in Chicago called each other to have phone sex and they

would talk dirty on the phone and caress their body parts and ejaculate; (8) relaying

to her that one day while he was mowing his yard and his lawn mower was vibrating

and he took his penis out and laid it on the lawn mower and jacked off; (9) inquiring

whether she ever played with herself, and informing her that everyone played with themselves; (10) telling her that Rhonda, a lady he dated, was too old and he just used her for her brains; (11) indicating to her that Johnnie McCoy, another lady he dated, had gotten too fat after she had her baby, that he could get with her whenever he got ready, and that she was just good enough for giving "head"; and (12) sharing with her that he just liked to have phone sex.  Further the record substantiates that Smith-McKenzie did not welcome Sheriff Hatter's advances, that she rejected doing any of those sexual things that he was asking of her, and that she was subjectively bothered by his conduct.

Despite all this evidence offered in opposition to summary judgment, similar to their opening brief, the Sumter Defendants' reply brief also lacks any application of the facts, taken in a light most favorable to Smith-McKenzie.  Instead, the Sumter Defendants first state that Smith-McKenzie "has only articulated arguably three times in which Sheriff Hatter allegedly made inappropriate comments to her."  (Doc. 145 at 9 (emphasis by the Sumter Defendants)).

Then, they conclude, in blanket fashion, that "[e]ven if on[e] takes Plaintiff Smith-McKenzie's Statement of Additional Disputed Facts as true, the alleged statements do not meet the severe and pervasive criteria."  (*Id.*).  Additionally, the Sumter Defendants completely failed to address the substance of Smith-McKenzie's

76

potential quid pro quo claim relating to her desire to become a full-time dispatcher.[45]

---

[45]   The elements of a quid pro quo sexual harassment claim are:

(1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment.

*Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994). "When a supervisor requires sexual favors as quid pro quo for job benefits, the supervisor, by definition, acts as the company.  In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee.  Therein lies the quid pro quo.  In that case the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose.  He acts within the scope of his actual or apparent authority to hire, fire, discipline or promote." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989) (internal quotations and citations omitted).  While this court acknowledges that the Supreme Court companion cases of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) decline to embrace the hostile work environment versus quid pro quo division, the distinctions drawn in pre-*Faragher* and *Ellerth* cases are still helpful to evaluating the viability of Walker's sexual harassment claim and whether she has shown that she has suffered any actionable harassment. Under the *Faragher/Ellerth* framework:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence   instead addressing the applicability of an employer's affirmative defense the distinctions between the two types of harassment are hostile work environment[.]. . .   No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

77

Therefore, their Motion for Summary Judgment is due to be denied because the Sumter Defendants have failed to meet their burden under Rule 56.

Alternatively and independently, to the extent that the Sumter Defendants have even developed an appropriate argument in support of summary judgment on Smith-McKenzie's sexual harassment claim, the Motion for Summary Judgment is still due to be denied on the merits as to the severity or pervasiveness of Sheriff Hatter's conduct, including the numerous inappropriate sexual remarks made to her and at a minimum implicitly linking promoting her to a full-time dispatcher to her having phone sex with him.[46]

---

*Faragher*, 524 U.S. at 807 (citations omitted). Courts and parties still continue to use the pre-*Faragher/Ellerth* terminology to clarify the type of harassing conduct that is at issue.

[46]   The Sumter Defendants have made no merits argument against Smith-McKenzie's stand alone quid pro quo claim relating to the full-time dispatcher position, and indeed under the *Faragher/Ellerth* framework explained in n.45, *supra*, one may no longer exist. The court's point here is that the Sumter Defendants have similarly provided no explanation why this evidence does not constitute a tangible employment action under *Faragher/Ellerth* or alternatively why it should not also be considered as part of the severe or pervasive analysis under Smith-McKenzie's hostile work environment claim, in the event that it does not reach the tangible employment action threshold.

### d.    Walker's Procedural Due Process Claim[47]

Walker's procedural due process claim based upon a protected property interest relating to his continued employment as a Deputy Sheriff with the County is due to be dismissed.   "The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process." *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991).  Walker "has a procedural due process claim if []he can show the deprivation of a property or liberty interest." *Gilder-Lucas v. Elmore Co. Bd. of Educ.*, 399 F. Supp. 2d 1267, 1272 (M.D. Ala. 2005) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)).

"The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan*, 455 U.S. at 430 (quoting *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 11-12 (1978)).   "A constitutionally protected property interest is created if there are 'rules or mutually explicit understandings that support [a] claim of entitlement.'" *Warren*, 927 F.2d at

---

[47]    Because the parties have treated Walker's procedural due process claim separately from the topic of § 1983 official capacity claims alleged against Sheriff Hatter generally, the court does also.  As pled in Plaintiffs' third amended complaint, Walker asserts cCount XVIII against Sheriff Hatter in his official capacity and/or the Commission.  (Doc. 45 at 43-45).  However, in opposing summary judgment, Plaintiffs reference only "**the Sheriff**" and "the County."  (Doc. 141 at 40). Regardless, based upon the following analysis, dismissal is appropriate as to Sheriff Hatter in his official capacity, the County, and/or the Commission.

562 (quoting *Perry v. Sinderman*, 408 U.S. 593, 601 (1972)). "To obtain a protected property interest in employment, a person must have more than a mere unilateral expectation of continued employment; one must have a legitimate claim of entitlement to continued employment." *Warren*, 927 F.2d at 562 (citation omitted).

Walker premises his procedural due process claim on his receipt of the County's personnel manual and further claims that, under the terms of it, he was entitled to a hearing before Sheriff Hatter dismissed him. However, Walker has not demonstrated that the County's personnel manual applies to him.

More specifically, as the Alabama Court of Civil Appeals has resolved the issue of pretermination hearing rights sought by another sheriff deputy:

> As an initial matter, we must resolve whether Mack was an employee of the State of Alabama or of Wilcox County. If Mack was an employee of the county, then the county's personnel manual could confer on him certain pretermination due-process rights. Our caselaw is clear, however, that a sheriff's deputy is a state employee. *Whitten v. Lowe*, 677 So.2d 778, 780 (Ala. Civ. App. 1995).

*Mack v. Arnold*, 929 So. 2d 480, 484 (Ala. Civ. App. 2005) (emphasis added). Therefore, while it does not appear that the Supreme Court of Alabama has reached this issue, the second highest court in Alabama has concluded unequivocally that a county's personnel manual does not apply to a deputy sheriff, who is a state employee.

80

The analysis in a 2001 opinion from the office of the Alabama Attorney General also supports the conclusion a sheriff's deputy is normally not subject to the personnel policies applicable to county employees:

> The Sheriff does not need the permission of the Autauga County Commission to advertise for, hire, discipline, or fire deputies or jailers. A sheriff has the power to appoint, suspend, and fire deputies and jailers. *See* Ala. Code § 14-6-105 (1995); *Terry v. Cook*, 866 F. 2d 373, 379 (11th Cir. 1989). *See also* Opinion to Robert D. McWhorter, Jr., Attorney at Law, dated March 12, 1990, A.G. No. 90-00178; Opinion to Floyd R. Cook, Judge of Probate, Perry County, dated April 4, 1983, A.G. No. 83-00260. The county commission, however, has the authority to determine the number of deputies the sheriff can hire and to set the salary of the deputies and the jailers. Ala. Code § 14-6-105 (1995); Opinion to Robert D. McWhorter, Jr., dated March 12, 1990, A.G. No. 90-00178. Absent legislation, the county commission does not have the power to abolish or alter a sheriff's authority regarding his deputies. *Id.* In addition, the sheriff has the authority to suspend or dismiss jailers. Ala. Code § 14-6-1 (1995); Opinion to Barrown D. Lankster, Attorney at Law, dated September 29, 1988, A.G. No. 88-00484. Based on local law, the sheriff may hire and fire assistants without the approval of the county commission.

> <u>Deputy sheriffs and jailers are not county employees and are therefore not subject to the Autauga County personnel policy</u>. A deputy is the alter ego of the sheriff. *Terry* [*v. Cook*], 866 F.2d [373,] 377 [(11th Cir. 1989)]. A sheriff is not a county employee; he is a member of the executive branch of state government and, thus, a state official. Ala. Const. art. V, § 112; *Whitten v. Lowe*, 677 So. 2d 778, 780 (Ala. Civ. App. 1995), citing *Hooks v. Hitt*, 539 So. 2d 157 (Ala. 1988). <u>Therefore, a sheriff's deputy is not a county employee and is not entitled to protection under a local personnel policy</u>. *Whitten*, 677 So. 2d at 780.

> . . .

81

> The Autauga County Sheriff may hire his own deputies, clerks, and assistants and fix their compensation. The Autauga County Commission must approve the number of deputies, clerks, and assistants hired by the Sheriff and must approve their pay. <u>Deputies and jailers are not subject to the personnel policies established by the Autauga County Commission, absent a local law to the contrary</u>.

Ala. Att'y Gen. Op. 2001-217, 2001 WL 861907 (Jul. 6, 2001) (emphasis added).

Therefore, Alabama law makes it clear that, a deputy sheriff is a state employee under state law and further that in the absence of any local law to the contrary, a deputy sheriff is not subject to the personnel policies of the particular county in which he works. Plaintiffs' opposition does not point to any local law applicable to the County that overrides these general principles or any controlling case authority that holds otherwise. Nor does Plaintiffs' opposition suggest that, in the past, other sheriff deputies operating in the County, have been afforded a pretermination hearing.[48]

Accordingly, Walker has not met his burden in opposing summary judgment, and he is not afforded any protection under the County's personnel manual because he was not an employee of the County. Relatedly, Walker has no actionable due process claim against Sheriff Hatter (or the other Sumter Defendants for that matter) attributable to the failure to follow such policies in his dismissal as a matter of law.

---

[48]   Even if Walker had tried to rely upon past treatment of other sheriff deputies, whether that type of evidence would have saved his procedural due process claim is doubtful as "a mutual understanding cannot create a property interest contrary to state law." *Warren*, 927 F.2d at 564 (citations omitted).

## V.    CONCLUSION

Therefore, for the reasons stated above, ADPS's Motion for Summary Judgment is due to be granted.  Accordingly, Counts VII and XI against ADPS are due to be dismissed.

The Sumter Defendants' Motion for Summary Judgment, however, is due to be partially granted only.  More specifically, Count II against Sheriff Hatter in his individual capacity is due to be dismissed only as to the claims of constructive discharge in violation of the Equal Protection Clause of the Fourteenth Amendment through § 1983.  All other claims in Count II remain.

Counts III and IV against the Commission are due to dismissed.  Similarly, Counts V and VI against the County are also due to be dismissed.

Count IX against the Commission is due to be dismissed, as is Count X against the County.  Count XIII against Sheriff Hatter in his individual capacity for race discrimination is due to be dismissed only as to claims of termination in violation of the Equal Protection Clause of the Fourteenth Amendment and § 1981 through § 1983.[49]  All other claims in Count XIII remain.

---

[49]    The court notes that discriminatory discharge may be the only actual race discrimination claim that Walker intends to pursue against Sheriff Hatter in his individual capacity under Count XIII.  (*See generally* Doc. 45 ¶¶ 203-214).  If this is true, then Count XIII is due to be dismissed in its entirety.  However, Walker also complains that Sheriff Hatter took other discriminatory actions against him based on

Counts XIV and XV against the Commission are due to be dismissed. Similarly, Counts XVI and XVII against the County are also due to be dismissed.

Count XVIII against Sheriff Hatter in his official capacity and/or the Commission is due to be dismissed. Finally, with Plaintiffs' express consent, the Sheriff's Department and all claims asserted against it are due to be dismissed.

An order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this the 2nd day of October 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

race in this count, including placing him on administrative leave. (Doc. 45 ¶ 204). This is another area which Plaintiffs will need to clean up as part of the pretrial process.

84